L. O. WARD et al., Appellants,

v.

CORPORATION COMMISSION of the State of Oklahoma, and Tenneco Oil Company, Appellees.

Nos. 44894 and 45043.

Supreme Court of Oklahoma.

Sept. 19, 1972.

Bill Mobley, Tom Baker, Brown, Verity, Brown & Baker, by Paul Brown, Oklahoma City, for appellants.

Walker & Watson, by Barth P. Walker, Oklahoma City, for appellees.

DAVISON, Vice Chief Justice:

We have heretofore answered many questions that have been presented by the application of 52 O.S.1961 § 87.1 (Supp. 1963) and its statutory predecessors which delegated to the Corporation Commission (Commission) the power and imposed the duty to prevent or minimize waste and drainage within a "common source of supply" as therein defined, of oil or gas or of oil and gas as therein defined.

To accomplish this statutory purpose, our Legislature designed procedures to prevent the drilling of unnecessary wells. Stated simply § 87.1 authorizes the Commission to establish well spacing (drilling) units over what appears to be a common source of supply, prescribe the drilling location within the unit and prohibit, with restricted exception, the drilling of any well on the unit, except the prescribed unit well at the prescribed location.

The question presented is whether nondrilling oil and gas lessees and owners within the unit share in the unit production as of the date the Commission order established the spacing (drilling) unit. As it will appear later, the terms "spacing order and pooling order" are confused in § 87.1, and the purpose of each order will become clear as we discern what each order is designed to accomplish and isolate the legal consequences of each order.

The parties do not agree entirely concerning what facts are relevant and material to the question we are required to answer.

We first recite verbatim the statement of the case by the Appellants, L. O. Ward and his associates:

"L. O. Ward and his associates Jack Choate, Carl E. Gungoll, Henry Gungoll, James Gungoll, Linda Gungoll and Roy W. Reed, who will jointly hereinafter be referred to as 'Ward,' own the oil and gas leasehold estate covering all of the NE¼ of Section 34, Township 20 North, Range 10 West, Major County, Oklahoma, and 140 acres in the SW¼ of the Section, and 15 acres in the SE¼. Tenneco Oil Company owned all of the NW¼, and 20 acres in the SW¼, and 145 acres in the SE¼ of the Section. The percentage ownership of the Section is owned 45 per cent by Ward and 55 per cent by Tenneco.

Ward commenced operations for the drilling of the No. 1 Freed well in the NE¼ of Section 34 on or about December 5, 1968, and completed the well as an extremely fine producer in the Hunton formation on or about January 7, 1969, long before the area was spaced into drilling and spacing units.

The chronological order of facts that this Court will need to understand concerning the events leading to this controversy are as follows:

"1. As suggested above, the well was commenced in December 1968, and completed on January 7, 1969;

2. The area was unspaced in any formation when the well was commenced and completed;

3. On February 4, 1969, Tenneco filed an Application CD No. 29,982, seeking 640-acre Hunton and Mississippi spacing. On March 11, 1969, Ward filed an Application, CD No. 30,197, seeking 160-acre spacing for the Hunton formation;

4. The two applications were combined for hearing, and on June 26, 1969, the Commission issued its Order No. 75,137 in the combined hearings, which fixed 640-acre drilling and spacing units in the Hunton and Mississippi common sources of supply;

5. Ward appealed this Order to the Supreme Court vigorously contending that all of Section 34 was not underlain by productive Hunton formation, and that, even if it was, the economics were such that four wells could economically be drilled in the Section, and that sufficient additional reserves of condensate from the Hunton formation would be recovered that would otherwise not be recovered if only one well was drilled, thus creating waste. Irrespective of Ward's position, this Court affirmed the Order of the Corporation on June 9, 1970 (470 P. 2d 993);

6. On the 17th day of February, 1971, the Commission entered its Order No. 83,811, on the Application of Tenneco Oil Company force-pooling the owners of the leases in Section 34. The effect of this Order was to determine that the owners of all leases in Section 34 had a right to participate in the production from the Freed well previously drilled by Ward in the Section. On February 26, 1971, Tenneco filed a Motion for modification of Order No. 83,811 (the force-pooling Order), and on May 4, 1971, the Commission issued its Order No. 84,842, which provides in effect that Tenneco was entitled to participate in the production from the well from and after June 26, 1969, which is the date of the spacing order, contrary to the position of Ward that the right of Tenneco to participate in the well stems only from the date of the force-pooling Order No. 84,842, which is May 4, 1971."

The following additional statement appears in Appellant's argument of his first proposition:

"During this interval of time [between January 26, 1969, the date of the spac-

ing order and May 4, 1971, the date of the pooling order], approximately $100,000.00 of gas and condensate was sold from the well. Although Ward had completed the well in January of 1969, the well did not go on stream for a considerable period of time awaiting a favorable market. Ward could have produced the well upon completion, on or about January 7, 1969, until June 26, 1969, the date of the spacing order, and owned all of the production without question. This is a period in excess of five months, and Ward's testimony (R. 55), is that the well would have produced approximately $100,000.00 worth of products per month, or a gross production of in excess of $500,000.00, during this period of time. By waiting on a more favorable market Ward kept the well shut in, but did produce in excess of $100,000.00 worth of products during the period of time concerned with the issues in this case. * * *."

Appellee, Tenneco Oil Company, says:

"The question in this case must be decided on these facts:

1. Plaintiffs in Error drilled a well on a quarter section of land for which no drilling and spacing unit had been established.

2. The well was completed as a well capable of producing gas and gas condensate from the Hunton common source of supply.

3. The Commission established a 640-acre drilling and spacing unit for said well and said common source of supply.

4. Plaintiffs in Error own about 45 per cent of the drilling and spacing unit area and Tenneco owns about 55 per cent thereof.

5. After the drilling and spacing unit was created Tenneco endeavored to pay its pro-rata share of the cost of the well and to participate in a like pro-rata share of the production from the well;

Plaintiffs in Error refused to accept payment or to permit participation in such production.

6. Tenneco asked the Commission to determine its rights in the well; the Commission entered Order No. 83811 as amended by Order No. 84842 wherein it was found that Tenneco had the right, on paying its pro-rata share of the cost of the well, to participate in all production from the well from and after the date the drilling and spacing unit was established."

This appeal is from the Order of the Commission No. 83811, as amended by Order No. 84842, holding that Appellee, Tenneco Oil Company, had the right, commencing on the date the applicable spacing order was established, upon paying its pro-rata share of the cost of the well, to participate in all production from the well drilled by Ward and associates on the NE¼ of Section 34, Twp. 20 N, Range 10 West, Major County, Oklahoma.

We find that Wood Oil Co. v. Corporation Commission, 205 Okl. 537, 239 P.2d 1023, held that the non-drilling owners of a divided interest (the owner of an undivided interest was not involved) in a spacing unit is entitled to share in the production from the unit well commencing on the date the Commission established the unit.

The antecedent facts as recited in the companion case of Wood Oil Company v. Corporation Commission, 205 Okl. 534, 239 P.2d 1021, follows: It was there revealed that on April 1, 1947, on an application by Sinclair Prairie Oil and Gas Company, the Commission extended the lines of the Wayne Pool, which then included the East half of Section 14, T5N, R2W, McClain County, to include among other lands the West Half of Section 14. Wood Oil had obtained production on December 21, 1946 from a well on the East ten acres of the Northeast Quarter of the Northwest Quarter of Section 14. The judgment in 239 P.2d 1021 affirmed the Commission Order of April 1, 1947, extending the boundaries of the Wayne Pool. The effect of the Or-

der was to make the Wood well a unit well. Toklan in 239 P.2d 1023, by virtue of the Order of April 1, 1947, claimed the right to participate in the production from the unit well since the date of first production, December 21, 1946, rather than since the date of the extension of the spacing order April 1, 1947, which made the Wood Well a unit well. We reversed the Order of the Commission that sustained Toklan's claim, saying: "To the extent the Order holds Wood Oil accountable to Toklan directly or indirectly for a share in the production before the spacing [drilling] unit was created same is not authorized by law and it was error to so hold"

Anyone who entertained any doubt concerning what we held in 239 P.2d 1023 (Wood Oil Case No. 2) should have that doubt dispelled by reading our opinion in Wood Oil Company v. Corporation Commission, Okl., 268 P.2d 878 (Wood Oil Case No. 3). In Wood Oil Case No. 2, the Commission reserved jurisdiction to decide in what ratio Wood and Toklan should share in the production occurring on and after the date (April 1, 1947) the spacing order was established and should share in the investment, expense and salvage attributable to the unit well. Wood Oil Case No. 3 was an appeal by Wood Oil from an Order of the Commission dealing with this subject matter on an amended application by Toklan and Wood Oil's response.

In response to Wood Oil's contention that the Commission had no right to divide the production from its well in any manner, we repeated our holding in Wood Oil Case No. 2, when we said: * * * "In our opinion in Wood Oil Case 2, we held the Commission's order invalid as to that portion of the oil produced by the well prior to the time that body had exercised its jurisdiction over the matter by creating the spacing unit, but, as herein indicated, we still cannot agree with Wood Oil's contention as to that portion produced after said order was made and became effective."

Appellants cite Whitaker v. Texaco, Inc., 10 Cir., 283 F.2d 169, as stating a view contradictory to our statement of the holding in Wood Oil Case No. 2, and confirmed in Wood Oil Case No. 3. Appellants cite a syllabus which was not prepared by the court. The counterpart of the cited syllabus in the court's opinion reads:

"We see no distinction between this case and Panhandle which would require a different result from that reached in Panhandle. The question is one of lease continuation, not of compulsory unitization. The fact that upon the entry of a spacing order royalty interests are pooled by operation of law whereas working interests are pooled only upon voluntary agreement or upon a separate Commission order forcing unitization is unimportant."

In the cited case the Court is really saying by implication that its expression is dictum as applied to the facts in the case before it. It is surely erroneous dictum in the light of our holdings in Wood Oil Cases Nos. 2 and 3. However, the error may be a legislatively invited error because "pooling" seems to be used in two senses in § 87.1. For example, in § 87.1(d) this sentence appears: "The portion of the production allocated to the owner of each tract or interests included in *a well spacing unit formed by a pooling order* shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon." (Emphasis added). Antecedently, in the same subsection (d) the pooling concept appears in this context: " * * * Where, however, such owners have not agreed to pool their interests and where one such separate owner has drilled or proposes to drill a well on said unit to the common source of supply, the Commission, to avoid the drilling of unnecessary wells, or to protect correlative rights, shall, upon a proper application therefor and a hearing thereon, require such owners to pool and develop their lands in the spacing unit as a unit."

Rather than become involved too greatly and unnecessarily in semantics, it is to be observed that the Commission issues two types of basic orders under § 87.1, which the Commission does not label that have sometimes been referred to indiscriminately. Layton v. Pan American Petroleum Corporation, Okl., 383 P.2d 624; State ex rel. Com. of Land Office v. Carter Oil Company of West Virginia, Okl., 336 P.2d 1086. One type of order establishes spacing (drilling) units of a certain size over what appears to be a common source of supply and fixes the well location within the unit. When the unit is established only one well by operation of law may be drilled upon the unit, subject to rare exceptions. This order also recites what § 87.1 provides—that the various owners may "pool" their interest i. e., agree upon each owner's share of income, investment and expense, and if they cannot agree the Commission upon application will make that decision for them. This so-called "pooling" procedure is necessary because as a general rule the owners within a unit cannot guess the future soon enough or accurately enough to enter into or to attempt to enter into an operating agreement for the operation of the unit well.

But with the royalty owners and overriding royalty owners under the oil and gas lease or leases it is different. The operation is free of cost to them. Their interest is already either statutorily or contractually fixed. Accordingly, their participation in the gross income necessarily becomes fixed upon the establishment of the spacing (drilling) unit, and remains fixed no matter what options are accorded the non-drilling owners. No "pooling" procedure is necessary to fix their "free of cost rights" in the unit as it is necessary that the lessees' "not free of cost rights" be fixed either by agreement or order of the Commission.

Finally, we say that to give § 87.1 a construction that meets the constitutional requirements of due process, this section must mean, consonant with our holdings in Wood Oil Co. Cases Nos. 2 and 3, that the oil and gas lessees and others who own interests in the spacing (drilling) unit, share in the production of the unit well (whether drilled before or after the spacing (drilling) unit is established as of the time the unit is established. At the time the unit is established a unit well is or probably soon will be producing oil or gas. At the moment production commences, resulting pressure differentials in the common source of supply portend, in greater or less degree, drainage from all parts of the unit toward the producing unit well. This drainage is occurring from areas where oil and gas lessees are prohibited from doing anything to protect their leased premises from drainage. With the purpose of § 87.1 to prevent the drilling of unnecessary wells before it, the Commission will not, except in extreme cases, make an exception to the rule that permits one producing well only on each spacing (drilling) unit. To impose this denial without granting the right to participate in production of the unit well, as of the time the non-drilling owners were prohibited from drilling, is the taking by the State of their property without due process in violation of the Fourteenth Amendment to the Constitution of the United States. Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510. In this case the Appellant, Railroad Commission of Texas, issued a gas proration order based upon 160 acre well spacing that operated to require the Appellee to buy gas from other producers at a time it was being substantially drained by such other producers. The Appellee could produce its market requirement from its own wells without causing waste or draining from such other producers. This was held a denial to Appellee of due process. The court declared: "Our law reports present no more glaring instance of the taking of one man's property and giving it to another" and declared "and this court has many times warned that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." In this connection see Oklahoma

Constitution, Art. 2, Sec. 23. See, also, our application of Thompson v. Consolidated Gas Utilities Corp. in Oklahoma Natural Gas Company v. Choctaw Gas Co., 205 Okl. 255, 236 P.2d 970.

The distribution of unit production among the owners of oil and gas leasehold estates and other owners in a unit, established under § 87.1, is doing what we sanctioned in Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83, Appeal Dismissed 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231, when we said:

> "Thus, in our opinion, it is well established that the police power of the state extends to protecting the correlative rights of owners in a common source of oil and gas supply and this power may be lawfully exercised by regulating the drilling of wells into said common source of supply and distributing the production thereof among the owners of mineral rights in land overlying said common source of supply."

The Order of the Corporation Commission No. 84842, is affirmed.

BERRY, C. J., and WILLIAMS, JACKSON, IRWIN, HODGES, LAVENDER and BARNES, JJ., concur.