**ATLANTIC RICHFIELD COMPANY, a Delaware corporation; Nicor Exploration Company, a Delaware corporation, Plaintiffs,**

v.

**Prentis B. TOMLINSON, Jr., Trustee; Royalty Partners, a Texas limited partnership; John Brewster, Trustee; Genevieve Crane; Dorothy June Ashinhurst a/k/a Dorothy June Grayson, Defendants.**

No. 78350.

Supreme Court of Oklahoma.

July 20, 1993.

Rehearing Denied Sept. 22, 1993.

Joseph W. Morris, Richard B. Noulles, Teresa B. Adwan and M. Benjamin Singletary, Gable & Gotwals, Tulsa, David D. Morgan and Michael L. Tinney, Ames, Ashabranner, Taylor, Lawrence, Laudick & Morgan, Oklahoma City, for plaintiffs.

Russell James Walker, Walker, Walker & Driskell, Oklahoma City, for defendants.

WATT, Justice:

The United States District Court for the Eastern District of Oklahoma has certified several questions of state law to this Court pursuant to the Oklahoma Uniform Certification of Questions of Law Act, 20 O.S. 1991 § 1601, et seq.

## FACTS AND PROCEDURAL HISTORY

Before the federal court is an action to determine title to an oil and gas leasehold interest. The mineral interest covered by the disputed lease is an undivided one-half interest in the oil, gas and other minerals in the Northwest Quarter of the Northeast Quarter of Section 24, Township 5 North, Range 18 East, Latimer County, Oklahoma (hereinafter referred to as the "NW/4 NE/4").

In 1941, Will J. Shaw conveyed the surface estate of the NW/4 NE/4 to J.W. Martin. The warranty deed reflected that Shaw reserved all the mineral interest underlying the NW/4 NE/4 to himself. However, in preparing the abstracted version of that warranty deed, the abstracting company failed to note the reservation of the mineral estate by Shaw. Consequently, the abstract showed Martin as the owner of both the surface and the mineral estates.

In 1942, Martin purported to convey the fee interest in the NW/4 NE/4 by warranty deed to Genevieve Crane, one of Will Shaw's two daughters.

In 1953, Crane executed an oil and gas lease to A.B. Soper as lessee. The Soper Lease covered the NW/4 NE/4 and a 20-acre tract owned by Crane to the south. This is the only oil and gas lease that has ever covered the NW/4 NE/4. Crane received all delay rentals under the lease.

In June of 1958, Will Shaw died. Although none of his probate documents listed the mineral interest in the NW/4 NE/4, Shaw owned record title to that mineral estate at the time of his death. Under the probate of Shaw's estate, the residuary portion of the estate went to Shaw's widow, Victoria Shaw, as a life tenant, with the remainder to his heirs. Will Shaw's heirs were Victoria Shaw and his two daughters, Crane and Dorothy June Ashinhurst.

On January 6, 1961, the Oklahoma Corporation Commission issued an order establishing all of Section 24, Township 5 North, Range 18 East, Latimer County, as a 640-acre drilling and spacing unit for certain oil and gas formations. The Soper Lease was within that drilling and spacing unit. Later, the predecessor in interest of plaintiff Atlantic Richfield Company (ARCO) drilled and completed the James Unit No. 1–A well in the NW/4 of Section 24. The diagram below depicts the approximate locations of the unit well, Soper Lease and disputed tract.

**Section 24**

░░ denotes approximate area covered by Soper Lease

---

ARCO or its predecessor bore all costs of drilling the unit well, which was drilled within the primary term of the Soper Lease and has continued to produce to the present time. Title opinions rendered before and after the drilling of the James Unit No. 1–A well were based upon the erroneous abstract. The title opinions showed Crane as the owner of the mineral interest in the NW/4 NE/4 and plaintiffs or their predecessors as owners of the lease covering that mineral estate. From 1962 until 1988, Crane received royalty proceeds as if she was the sole owner of the mineral interest in the NW/4 NE/4. ARCO or its predecessors have operated the unit well since its inception.

The James Unit No. 1–A well also covered separate acreage owned by Victoria Shaw, Crane and Ashinhurst, as heirs of Will Shaw. In September of 1964, the three women executed separate royalty division orders that reflected their mineral interests in that separate acreage. The royalty division orders set forth the ownership of the other mineral estates in the unit and showed Crane as the owner of the "full

interest" in the NW/4 NE/4. There is no indication that Victoria Shaw or Ashinhurst disputed the division order's statement of Crane's "full interest" in the NW/4 NE/4.

In 1966, Crane and plaintiffs' predecessors in interest filed an action to quiet title to several tracts of land in Section 24, including the tracts covered by the Soper Lease. The quiet title suit was brought against several defendants, including Will J. Shaw, if living, and his "unknown heirs," if deceased. Victoria Shaw and Ashinhurst were not named as defendants in that lawsuit. Crane and plaintiffs' predecessors stated in their verified petition that they had diligently tried to ascertain the identity of the named defendants' heirs, but that they were not ascertainable. Service by publication was made upon the unknown heirs of the named parties in the quiet title action and the quiet title judgment approved that publication service. The final judgment entered on July 17, 1967, quieted title in Crane and plaintiffs' predecessors to the NW/4 NE/4 and the acreage south of that tract.

Victoria Shaw died on January 19, 1970. In the probate of her estate, Shaw's heirs, Crane and Ashinhurst, entered into a "family settlement" agreeing to share equally all assets and property. No probate documents showed that Victoria Shaw owned any mineral interest in the NW/4 NE/4. According to the record title, however, after January 19, 1970, Crane and Ashinhurst each owned a one-half mineral interest in the NW/4 NE/4 as heirs of their parents' estates.

In 1988, defendants Prentis B. Tomlinson, Jr., Royalty Partners and John Brewster discovered that Crane and Ashinhurst each held record title to one-half of the minerals underlying the NW/4 NE/4. After purchasing Ashinhurst's one-half interest, Tomlinson, Royalty Partners and Brewster claimed a right to share in the revenues of the James Unit No. 1–A well from the time of the well's first production. Royalty Partners then filed with the Oklahoma Corporation Commission an application to pool interests and adjudicate rights and equities of oil and gas owners in certain formations in Section 24, including the mineral interests in the NW/4 NE/4. Thereafter, plaintiffs filed the present action in federal court seeking to quiet title to the mineral leasehold interest in the NW/4 NE/4. The Commission proceedings were stayed pending resolution of the federal court suit.

Plaintiffs claim that they and their lessor, Crane, acquired prescriptive title to the full mineral interest in the NW/4 NE/4. Defendants contend that a "forced pooling" by the Corporation Commission is the only means for adjudicating the rights and equities of ownership in the spacing unit. Defendants also assert that the conservation laws of Oklahoma cannot be used to create a power to adversely possess the mineral interest in one tract by possessing the minerals in another tract within a spacing unit.

Although Genevieve Crane was originally named as a defendant in this action, she was dismissed as a party on plaintiffs' motion.

## CERTIFIED QUESTIONS OF STATE LAW

The federal court has posed the following questions of state law:

1(a) Can the drilling of and production from a unit well in a 640–acre drilling and spacing unit created by the Oklahoma Corporation Commission give rise to and constitute adverse possession of a severed mineral interest in the oil and gas underlying a 40–acre tract within the unit, or of the leasehold interest therein, under the following conditions:

(i) the unit well is 970 feet from, but is not located on the 40–acre tract;

(ii) in drilling the unit well and producing the oil and gas therefrom, the adverse claimants (the lessor of the minerals and her lessee) acted under color of title and claim of right to the oil and gas underlying the 40–acre tract;

(iii) the record owner of the oil and gas underlying the 40–acre tract was not aware that she owned any interest in the oil and gas underlying that tract and, as

the owner of an oil and gas interest in a different tract within the same unit, executed a Division Order reflecting that the adverse claimants owned the oil and gas underlying the 40–acre tract; and

(iv) for over 25 years the adverse claimants received all payments attributable to production from the 40–acre tract and bore all expenses of drilling and production attributable to that tract?

(b) If the answer to question 1(a) is negative, then can the possession of the oil and gas interests in the tract by the adversely claiming lessor, and the possession of that mineral leasehold by the oil and gas lessee, from 1970 through 1988, give rise to adverse possession of the entire oil and gas interest underlying the 40–acre tract, or of the leasehold interest therein against the record owner and co-tenant, under the following conditions:

(i) the adversely claiming lessor obtained a deed conveying color of title to the oil and gas underlying the 40–acre tract in 1942;

(ii) the 40–acre tract was included within a 640–acre drilling and spacing unit created by the Oklahoma Corporation Commission in 1961;

(iii) the adversely claiming lessee drilled and completed a unit well on a different tract in the unit in 1962, acting under color of title and claim of right to all of the oil and gas underlying the 40–acre tract;

(iv) the adversely claiming lessor and the other record owner each inherited an undivided one-half (½) interest in the oil and gas underlying the 40–acre tract in 1970, making them co-tenants; and

(v) from 1970 through 1988 the record owner and co-tenant was not aware that she owned a one-half (½) interest in the oil and gas underlying the 40–acre tract, and the adversely claiming lessor believed she owned all of the oil and gas underlying the 40–acre tract and received all the royalty payments attributable to all oil and gas production from the 40–acre tract, under claim of right thereto, and the adversely claiming lessee re-

ceived all production proceeds, and bore all operating costs, attributable to the full working interest in the 40–acre tract?

(c) Under the stipulated and undisputed facts in this case, has (i) the adversely claiming lessor and/or (ii) the adversely claiming lessee, fulfilled the requirements for adverse possession of the oil and gas underlying the 40–acre tract in issue?

(d) If the answer to question 1(c) is affirmative, does the prescriptive title extend to all oil and gas underlying the 40–acre tract in issue, or just to the oil and gas within the formations being drained by the unit well?

(e) If the answer to questions 1(a), 1(b) or 1(c) is negative, is a "forced pooling" action before the Oklahoma Corporation Commission the only means for adjudicating the rights and equities of ownership in the spacing unit and the unit well?

2. If the answer to questions 1(a), 1(b) or 1(c) is affirmative, under Oklahoma law must co-tenants know of their status as co-tenants before an ouster of one cotenant by the other can occur?

3. Does the operator of a well have a fiduciary relationship with other working interest owners in the unit that would preclude the operator from establishing title by prescription to a disputed mineral interest or any portion thereof?

4. What effect does a judgment quieting title to a mineral interest have upon heirs who were known, but were not named as defendants, although the decedent and his "unknown heirs" were named as defendants?

5. Is the champerty statute, found at Okla.Stat. tit. 21, § 548, applicable to conveyances of oil and gas rights?

## FOREWORD AND SUMMARY OF HOLDING

We begin our analysis by emphasizing that Genevieve Crane is not a party to the action before the federal court. This Court

does not decide hypothetical questions [1] and Crane has made no claim of adverse possession of her sister's undivided ½ mineral interest in the NW/4 NE/4. Therefore, we are constrained to address the federal court's certified questions only insofar as they apply to the litigants of this action. With this limitation firmly in mind, we answer the questions as follows.

We hold that a leasehold interest may not be adversely possessed either (1) by the drilling of and production of oil and gas from a well drilled on a separate tract of land within a drilling and spacing unit created by the Corporation Commission, or (2) by the possession of that oil and gas leasehold under a claim of right for the statutory period. Because we answer Certified Questions 1(a), 1(b) and 1(c) in the negative, we need not address Certified Questions 1(d), 2 or 3. We also hold that, while the Commission has jurisdiction to resolve issues involving correlative rights of mineral interest owners within a drilling and spacing unit, jurisdiction to decide the present quiet title action properly lies with the district court. We hold that the 1967 quiet title judgment has no effect upon defendants' mineral interest rights in the NW/4 NE/4, because they were neither parties nor privies to the quiet title action. Finally, because plaintiffs cannot, under the facts presented, establish a prescriptive leasehold to the disputed minerals beneath the NW/4 NE/4, the champerty statute is inapplicable to this case.

## I.

### ADVERSE POSSESSION

Regarding adverse possession, the decisive issue in this case is whether production from the James Unit No. 1–A well, located in the NW/4, constituted production from the NW/4 NE/4. Plaintiffs' primary argument is that after the creation of a spacing unit by the Corporation Commission, production from a unit well is treated as occurring from all tracts within the unit.[2] Relying on this premise, they argue that a portion of the production from the unit well was directly "attributable" to the NW/4 NE/4. Thus, plaintiffs conclude that their production from the unit well and/or possession of the minerals "attributable" to the NW/4 NE/4 has resulted in the acquisition of a prescriptive leasehold to defendants' severed mineral interest in that tract.

Each of the cases relied upon by plaintiffs [3] involved the rights of mineral interest owners and/or their lessees to share in the production of a unit well pursuant to § 87.1 of the Oklahoma Oil and Gas Conservation Act, 52 O.S.1981 § 81, et seq. None of the cited cases addressed the power to adversely possess a mineral interest or leasehold in one tract by production from a separate tract, nor did they involve a dispute over *ownership* of a mineral estate or lease. Because of this distinction, and for the reasons set forth below, we hold that plaintiff's "attribution" theory is not applicable in the context of adverse possession.

In order for a person to adversely possess a severed mineral estate, he must actually open a well on a tract of land and reduce the minerals under that tract to possession for the statutory period. *Mohoma Oil Co. v. Ambassador Oil Corp.,* 474 P.2d 950, 960 (Okla.1970). Under the law of capture, a landowner or mineral owner does not own migratory substances underlying his land. He only has an exclusive right to drill for, produce, or otherwise gain possession of such substances. *Frost v. Ponca City,* 541 P.2d 1321, 1323 (Okla. 1975). *See also Feely v. Davis,* 784 P.2d 1066, 1068 (Okla.1989). This Court has de-

---

**1.** *Rogers v. Excise Bd. of Greer County,* 701 P.2d 754, 761 (Okla.1984); *Bagby v. Trustees of Claremore Jr. College Auth.,* 525 P.2d 1355, 1356 (Okla.1974).

**2.** *See Kuykendall v. Helmerich & Payne, Inc.,* 741 P.2d 869 (Okla.1987); *Ward v. Corporation Comm'n,* 501 P.2d 503 (Okla.1972); *Sunray DX*

*Oil Co. v. Cole,* 461 P.2d 305 (Okla.1969), *cert. denied* 396 U.S. 907, 90 S.Ct. 223, 24 L.Ed.2d 183 (1969); *Oklahoma Natural Gas Co. v. Long,* 406 P.2d 499 (Okla.1965); *Layton v. Pan American Petroleum Corp.,* 383 P.2d 624 (Okla.1963).

**3.** *See* note 2, *supra.*

termined that those rights include the right to reduce to possession oil and gas "coming from land belonging to others." *Kuykendall v. Corporation Comm'n*, 634 P.2d 711, 716 (Okla.1981); *Wood Oil Co. v. Corporation Comm'n*, 205 Okla. 537, 239 P.2d 1023, 1026 (1950). Because title or ownership of migratory substances is not acquired until the substances are reduced to actual possession and controlled,[4] an owner or his lessee may drain the substances from under an adjacent tract without violating the rights of the owner whose tract is being drained.

■ The foregoing demonstrates that under the law of capture a person cannot acquire prescriptive title to minerals drained from *any tract other than that upon which his well is located.* Plaintiffs concede that they could never have established a prescriptive leasehold to defendants' severed mineral interest in the absence of a drilling and spacing unit. They contend, however, that the law of capture was altered through the creation of a drilling and spacing unit in Section 24. We must therefore determine what effect the drilling and spacing unit had upon the law of capture and plaintiffs' ability to adversely possess the leasehold interest in the disputed minerals in the NW/4 NE/4.

■ Initially, we note that the purpose of 52 O.S. § 87.1 is to prevent the drilling of unnecessary wells. *Ward v. Corporation Comm'n*, 501 P.2d 503, 507 (Okla. 1972). When the Commission creates a drilling and spacing unit, except in extreme cases, only one producing well may be drilled on the unit. The drilling of any other well within the unit is prohibited. *Id.;* 52 O.S. § 87.1(e). It is because of this rule that we held in *Ward* that non-drilling owners within a drilling and spacing unit must be permitted to participate in production of the unit well. "To impose this denial without granting the right to participate in production of the unit well, as of the time the non-drilling owners were prohibited from drilling, is the taking by the State of their property without due process

in violation of the Fourteenth Amendment to the Constitution of the United States." *Ward* at 507.

■ Applying *Ward* to the present case, we hold that under the due process clause, the state could not deprive Ashinhurst of her right to drill a well, while permitting the adverse acquisition of that interest through production from a statutorily created unit well. Because the state forbade Ashinhurst from drilling her own well, the state must protect her against the adverse acquisition of those rights through production from another well. This is particularly true where such adverse possession is attempted through production from a well established by state action.

■ The Oil and Gas Conservation Act confers upon the Commission limited authority to protect correlative rights in the development and production of oil and gas. *Samson Resources Co. v. Corporation Comm'n*, 702 P.2d 19 (Okla.1985). The power to protect correlative rights is limited by definition and by the terms of the Act. *Id.* at 22. Under the Act, the Commission may (1) establish drilling and spacing units and set production allowables, (2) permit the drilling of additional wells in a spacing unit, and (3) order unit interests pooled where owners cannot agree on terms regarding voluntary development. *Id.* at 22–23. "Aside from the recognized power to monitor certain terms and conditions of the contract imposed on the parties through a forced pooling order, *no other powers to protect correlative rights are granted or implied by this statute.*" *Id.* at 23 (emphasis added).

■ The Act was established to protect correlative rights. *See Inexco Oil Co. v. Corporation Comm'n*, 628 P.2d 362, 364 (Okla.1981). As we noted in *Samson,* the Act specifies certain limited powers that the Commission may exercise in attempting to protect those rights. If "no other powers to protect correlative rights are granted or implied by this statute," it is axiomatic that the law of capture is affected only to

---

4. *Feely,* 784 P.2d at 1068; *Frost,* 541 P.2d at 1323.

the extent contemplated by the exercise of those powers enumerated in the Act:

> The law of capture, under which oil and gas is owned by the one lawfully reducing it to possession, still obtains in Oklahoma, except as it has been or may be regulated or restricted under laws passed in the exercise of the police power, such as the proration and spacing statutes and city zoning ordinances. Those laws do not abrogate the law of capture. They are not self-executing. They simply authorize administrative boards to issue orders that have the effect of regulating or abrogating in a measure the law of capture.

*Gruger v. Phillips Petroleum Co.*, 192 Okl. 259, 135 P.2d 485, 488 (1943).

Adverse possession and prescriptive titles are not addressed by the Act. The enumerated provisions of the Act affect the law of capture only with respect to *sharing in production* of a unit well. No other provisions are implied. Because the Act does not alter the applicable property law rules to be used in determining *ownership* of an interest included within a drilling and spacing unit, the law of capture controls the instant case. Applying the law of capture to the facts presented, we hold that plaintiffs did not establish a prescriptive leasehold to defendants' mineral interest in the NW/4 NE/4.

▆ On the basis of the foregoing, we answer Certified Questions 1(a), 1(b) and 1(c) in the negative. We hold that a leasehold interest may not be adversely possessed either (1) by the drilling of and production of oil and gas from a well drilled on a separate tract of land within a drilling and spacing unit created by the Commission, or (2) by the possession of that oil and gas leasehold under a claim of right for the statutory period. Because we answer the foregoing questions in the negative, we need not address Certified Questions 1(d), 2 or 3.

## II.

### FORCED POOLING

▆ In Certified Question 1(e), the federal court asks whether a forced pooling action before the Oklahoma Corporation Commission is the only means for adjudicating the rights and equities of ownership in the spacing unit and unit well. The Act confers upon the Commission authority to order forced pooling to protect correlative rights of mineral interest owners within a spacing unit. 52 O.S.1991 § 87.1(e). This Court has held that the Commission "has the sole authority to adjust the equities and to protect the correlative rights of interested parties." *Woods Petroleum Corp. v. Sledge*, 632 P.2d 393, 396 (Okla.1981). However, the instant case involves a dispute over *ownership* of certain oil and gas interests, not a dispute over *rights and equities* of interest owners within a drilling and spacing unit.

Article 7, § 7 of Oklahoma's Constitution provides that "the District Court shall have unlimited original jurisdiction of all justiciable matters, except as otherwise provided in this Article, and such powers of review of administrative action as may be provided by statute." Title 52, O.S.Supp.1988, § 87.1, defines the Commission's authority relative to a common source of supply and well spacing and drilling units. However, we have construed this statute to vest jurisdiction of *public right* disputes in the [C]ommission, whereas, disputes over *private rights* are properly brought in the district court. In other words, the [C]ommission's jurisdiction is limited to protection of public rights in development and production of oil and gas.

*Leck v. Continental Oil Co.*, 800 P.2d 224, 226 (Okla.1989) (emphasis in original, citations omitted).

The case before the district court is not a situation "in which a conflict exists which actually affects [correlative] rights within a common source of supply and thus affects the public interest in the protection of production from that source as a whole." *Samson*, 702 P.2d at 22. Rather, it is a quiet title action to determine ownership in an oil and gas leasehold interest. Jurisdiction to resolve this dispute involving pri-

vate rights properly lies with the district court. Should an issue involving correlative rights arise after title is settled, jurisdiction would lie with the Commission.

## III.

### EFFECT OF 1967 QUIET TITLE JUDGMENT

 As previously set forth, the defendants' claim to title to the NW/4 NE/4 originated through heirship from Will J. Shaw and the 1967 quiet title judgment determined that Will J. Shaw's heirs were unknown. On the basis of these facts, plaintiffs contend that the defendants cannot now seek to avoid the effect of that judgment by relying on collateral facts to establish that the heirs of Will J. Shaw were known. Defendants assert that they are not bound by the 1967 judgment because they were not parties in that action. We agree with defendants and hold that the prior judgment does not affect their title to the disputed property.

 Initially, we agree with plaintiffs that a party cannot rely upon matters outside of the judgment roll in attacking a judgment which is not void on its face. *See Panhandle Royalty Co. v. Farni*, 747 P.2d 932, 934 (Okla.1987). However, the document upon which plaintiffs must rely in attempting to prove that defendants are bound by the quiet title judgment is the same "collateral facts" about which they now complain. Neither Victoria Shaw nor Dorothy Ashinhurst were specifically named as defendants in the 1967 suit. Therefore, in order to establish that these women were parties to that action and thus bound by the 1967 judgment, plaintiffs must establish that Victoria and Ashinhurst were the "unknown heirs" of Will J. Shaw. The document which shows that they were Shaw's heirs is the Final Decree for the Estate of Will J. Shaw, dated December 14, 1962. However, this is the same document which proves that Will J. Shaw's heirs were not, in fact, "unknown." Plaintiffs conceded this when they stipulated that "Will J. Shaw, deceased had no unknown heirs or devisees but only known,

judicially determined, living heirs and devisees, which were Victoria Shaw, and Crane and Ashinhurst."

 Ashinhurst need not rely upon extrinsic evidence to collaterally attack the quiet title judgment because she was neither a party nor a privy to that action. "Judgments bind only parties and privies—not strangers or persons not parties to the action." *Cartwright v. Atlas Chemical Industries, Inc.*, 623 P.2d 606, 611 (Okla. 1981). A person is a "privy" to an action if she:

> acquired an interest in the subject matter of the action either by inheritance, succession, or purchase from a party subsequently to the action, or [she holds] the property subordinately. The term 'subsequently to the action' means either after the suit is brought in which title or right is involved, or after the rendition of judgment.

*Dierks v. Walsh*, 203 Okl. 113, 218 P.2d 920, 923 (1950), quoting *Factor Oil Co. v. Brydia*, 184 Okl. 113, 85 P.2d 311 (1938).

Neither Dorothy Ashinhurst nor Victoria Shaw, from whom Ashinhurst derived a remainder interest, was a party to the quiet title action. Furthermore, under the definition set forth above, neither woman was a "privy" to the suit. When Will J. Shaw died in 1958, his mineral interest in the NW/4 NE/4 passed to Victoria Shaw for life, with the remainder to Victoria Shaw, Crane and Ashinhurst. Victoria Shaw and Ashinhurst acquired their interests *prior to* the filing of the quiet title action in 1966 and the rendition of the judgment in 1967. Accordingly, the quiet title judgment is not binding upon Ashinhurst. Further, the judgment is not binding upon Tomlinson, Brewster or Royalty Partners because they acquired their interests through Ashinhurst. *See Greco v. Foster*, 268 P.2d 215, 220 (Okla.1954).

Plaintiffs also argue that since the 1967 quiet title judgment was rendered prior to *Bomford v. Socony Mobil Oil Co.*, 440 P.2d 713 (Okla.1968), the publication service upon the "unknown heirs" of Will J. Shaw is valid despite that Shaw's heirs

were actually known to Crane. If we were concerned about the sufficiency of publication service upon Shaw's "unknown heirs," this Court would agree that pre-*Bomford* caselaw must be applied.[5] However, as we stated above, Victoria Shaw and Dorothy Ashinhurst were *known* heirs of Will J. Shaw and not parties to the quiet title action. Therefore, the sufficiency of publication service upon them is not at issue herein.

Our answer to Certified Question No. 4 is that the 1967 quiet title judgment has no effect upon the defendants' mineral interest rights in the NW/4 NE/4.

### IV.

### APPLICABILITY OF CHAMPERTY STATUTE, 21 O.S.1991 § 548

 The purpose of the champerty statute[6] is to protect adverse possessors from claims of persons based upon conveyances made in contravention of that law. *Bartlett v. Lashley,* 204 Okl. 299, 229 P.2d 185, 188 (1951); *Drennan v. Harris,* 67 Okl. 313, 170 P. 500 (1918) (Opinion on Reh'g). This Court has held that a conveyance made in contravention of the champerty statute is void as against persons holding adversely. *Cox v. Montgomery,* 282 P.2d 734, 736 (Okla.1955). In part I of this Opinion, we ruled that plaintiffs have not established a prescriptive leasehold to the disputed minerals underlying the NW/4 NE/4. Therefore, the champerty statute is inapplicable to the conveyance of Ashin-

hurst's mineral interest in that tract to the other defendants. *See Kennedy v. Hawkins,* 346 P.2d 342, 345 (Okla.1959).

CERTIFIED QUESTIONS ANSWERED.

LAVENDER, V.C.J., and SIMMS, HARGRAVE, ALMA WILSON and KAUGER, JJ., concur.

OPALA, J., concurs in part, dissents in part.

HODGES and SUMMERS, JJ., dissent.

---

5. Cases decided before *Bomford* required only that a publication affidavit recite that due diligence was used in attempting to discover the names and whereabouts of unknown heirs and assigns. *Bomford* altered the requisites for publication service by requiring that the particular probative facts showing due diligence be presented before a court may approve publication service. *Bomford,* 440 P.2d at 720. However, the holding in *Bomford* was specifically declared to be prospective only, *Id.* at 720, and this Court reviews the sufficiency of publication service under the law in existence at the time a particular decision was rendered. *See Panhandle Royalty Co. v. Farni,* 747 P.2d 932, 933 (Okla. 1987); *Barton v. Alpine Investments, Inc.,* 596 P.2d 532, 534 (Okla.1979), *cert. denied* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

6. Title 21 O.S.1991 § 548, provides in relevant part:

 Any person who buys or sells, or in any manner procures, or makes or takes any promise or covenant to convey any pretended right or title to any lands or tenements, unless the grantor thereof, or the person making such promise or covenant has been in possession, or he and those by whom he claims have been in possession of the same, or of the reversion and remainder thereof, or have taken the rents and profits thereof for the space of one (1) year before such grant, conveyance, sale promise, or covenant made, is guilty of a misdemeanor.