**OKLAHOMA OIL & GAS EXPLORATION DRILLING PROGRAM 1983–A, a Limited Partnership; Philip H. Myers, Individually, and Oklahoma Oil & Gas Exploration Company, a Virginia Corporation, Appellants,**

v.

**W.M.A. CORPORATION, Appellee.**

**Nos. 80,828, 80,829.**

Court of Appeals of Oklahoma, Division No. 3.

Feb. 1, 1994.

Rehearing Denied April 12, 1994.

Certiorari Denied June 15, 1994.

Robert H. Mitchell, Johnny J. Akins, Oklahoma City, for appellants.

Charles L. Helm, Oklahoma City, for appellee.

*OPINION*

HANSEN, Judge:

Appellants, Oklahoma Oil & Gas Exploration Drilling Program 1983–A (the 1983 Program), Philip H. Myers and Oklahoma Oil &

Gas Exploration Company seek review of the trial court's order which granted judgment in favor of Appellee, W.M.A. Corporation, (WMA).[1] This action involves the operation of several oil and gas wells in Grant County, Oklahoma. Appellants brought this action for an accounting, removal of the wells' operator, punitive damages by reason of WMA's bad faith, injunctive relief and judgment against W. Mike Adams personally as the alter ego of WMA. WMA counter-claimed, seeking recovery of past due operating expenses from Appellants. By partial summary judgment, the trial court determined W. Mike Adams is not the alter-ego of WMA for purposes of piercing WMA's corporate veil and dismissed Adams, and that Appellants are estopped to deny WMA's status as operator of the wells under the joint operating agreements (JOAs). After non-jury trial on the remaining issues, the trial court granted WMA judgment for Appellants' outstanding operating expenses, less certain credits, in the amount of $47,286.68.[2]

WMA received its interest in 28 oil and gas wells in Grant County, Oklahoma, by virtue of an assignment of well leases and operations from Laura M. Good d/b/a Compass Resources, dated March 2, 1987, effective April 1, 1987.[3] In connection with the transfer, Vaughn Good, Laura Good, and other consenting sellers entered into a purchase agreement on February 5, 1987, with the buyer, WMA, to close the deal and transfer operations. Both the assignments and the purchase agreement provided the operations would be transferred subject to WMA's obtaining a majority interest by purchase of the wells and leasehold or being elected the new operator for the wells with the approval of the Corporation Commission, if required. The assignment was further subject to all previous joint operating agreements (JOAs) affecting the wells and leasehold.

At the time of transfer, there were outstanding JOAs between Compass Resources and the other non-operating interest owners. The 1983 Program owns a non-operating working interest in four of the 28 wells. In April, 1987, WMA assumed operations of the wells. WMA never obtained JOAs in its name from the non-operating working interest owners.

■ On appeal, Appellants maintain the trial court erred in granting partial summary judgment. In our review of an order granting summary judgment, we must determine if the evidentiary matter supporting or opposing the motion reflect any substantial controversy as to any material fact. *Flanders v. Crane Co.*, 693 P.2d 602 (Okla.1984). Additionally, it must appear reasonable people exercising fair and impartial judgment could not reach differing conclusions upon the undisputed facts. *Flanders*, at 605.

■ WMA moved for summary judgment on two issues: whether Adams was the alter-ego of WMA and WMA's status as operator of the wells. In its summary judgment brief, WMA argued Appellants were estopped to deny its status as operator of the wells, that Appellants "ratified" the outstanding JOAs thereby confirming WMA's status as operator or, if they didn't ratify them, the other non-operators "elected" WMA as operator.[4] The trial court found Appellants knew WMA was acting as operator since April, 1987, that they paid joint interest billings (JIBs) which included operating and overhead expenses on the wells since WMA became operator until late in 1987, and that through their affirmative acts, consented to WMA's operation of the wells.

1. Appellants Myers and Oklahoma Oil and Gas Exploration Company are general partners of the 1983–A Program.

2. This action, C–88–49, was consolidated for trial with three other actions brought by Appellants: C–88–14, C–88–43, and C–88–44. These other actions have been appealed in a companion case, No. 80,829.

3. Laura Good received her interest in the leases and operations by assignment from Vaughn Good d/b/a Vaughn Good Oil Company, dated April 1, 1987, effective June 1, 1986.

4. Neither the Appellants nor Appellee pleaded breach of contract in this action. Although WMA's status as operator was presented to the trial court for determination, WMA's compliance or non-compliance with the election procedures for successor operators was not decided.

We agree with the trial court that the facts are not in dispute as to how WMA gained operations of these wells. The only issue to be decided is whether WMA is the operator according to the JOAs and the assignments. The JOAs between WMA's predecessors and the other working interest owners provide specific procedures for the resignation of operators and the election of successor operators. A successor operator must be "selected by the parties owning an interest in the Contract Area". The record indicates there was no formal selection process prior to WMA's assumption of operations. However, WMA assumed operations and actually operated the wells without protest through much of 1987.

Under certain circumstances, words or conduct of a party may operate to estop him from exacting literal compliance with contract terms. *Poteau State Bank v. Denwalt*, 597 P.2d 756 (Okla.1979). If a party leads one to believe that he will not insist upon literal performance of a contract term and the other party detrimentally relies thereon, the first party will be estopped from demanding literal compliance. *Id.*, at 759.

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy.

*McDowell v. Cagle*, 205 Okla. 554, 240 P.2d 783 (1951). The evidentiary material supporting WMA's motion for summary judgment shows Appellants were informed of WMA's takeover of operations on the wells in April, 1987, they paid portions of the JIBs submitted by WMA, they referred to WMA as operator of the wells to others and they failed to object to WMA's operation until "late in 1987". WMA relied on Appellants'

payment of JIBs and Appellants' failure to object to WMA's operation and continued to operate the wells, incurring costs for the benefit of all working interest owners. Under these undisputed facts, the trial court correctly concluded Appellants are estopped to deny WMA's status as operator of the wells.

Appellants maintain summary judgment was improper because disputed fact issues remain regarding whether W. Mike Adams was the alter ego of the corporation, WMA.[5] The general rule is that a corporation is a distinct legal entity separate and apart from other legal entities or stockholders. *Gulf Oil Corporation v. State*, 360 P.2d 933 (Okla.1961). However, this fiction may be avoided if it is established that the separate corporate existence is a design or scheme to perpetuate a fraud or where a corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another. *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 178 Okla. 15, 61 P.2d 645 (1936).

> To establish the "alter-ego" doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

1 Fletcher *Cyclopedia of the Laws of Private Corporations*, § 41.10 (Rev.Vol.1990).

Appellants presented facts establishing W. Mike Adams as the incorporator, sole shareholder, president and director of WMA. Although the evidence shows WMA had had trouble in the past meeting certain debts and that Adams loaned some money to WMA, there is no evidence WMA is undercapitalized or that Adams used the corporation to perpetuate a fraud. There are no disputed facts which justify a trial on this issue.

---

**5.** The trial court found that there was no evidence presented that would suggest that WMA is undercapitalized, that there is any kind of fraud

being perpetrated by W. Mike Adams against his creditors or that he is using the corporation as a shield against his creditors.

Next, Appellants challenge the trial court's award of interest on the November 24, 1992, judgment. The judgment provided it would bear interest at the contract rate of the prime rate plus 1% until paid. Appellants maintain the contract provision, § I(3)(B) of Exhibit C to the JOAs, doesn't authorize interest on the unpaid monthly expenses as it only pertains to *advance* billings.[6] That section provides:

3. Advances and Payments by Non–Operators

Unless otherwise provided for in the agreement, the Operator may require the Non–Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non–Operators.

Each non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

Section 3 of Exhibit C must be read in conjunction with the other applicable provisions of Exhibit C and the JOA. Article VII(C) of the JOA provides:

C. Payments and Accounting

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties *payment in advance* of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the net succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimated and invoice is received. *If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.* Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

Section 2 of Exhibit C provides:

2. Statement and Billings

Operator shall bill Non–Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classification of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

Under the JOA and Exhibit C, an operator has the *option* to require non-operators to pay monthly estimated operating expenses in advance. Art. VII(C) specifically provides a non-operator's failure to pay *estimated* expenses is subject to the interest described in Exhibit C. Paragraph 3 of Exhibit C, however, is not limited to advance billings. The provision applies to "Advances *and Payments* by Non–Operators", and specifically

---

6. Exhibit C to the JOAs is commonly referred to as a COPAS (Council of Petroleum Accountants Societies) form entitled "Accounting Procedure Joint Operations".

requires each non-operator to pay its proportion of *all bills* within 15 days after receipt. Thus, interest is chargeable on all outstanding, unpaid balances, whether the balance is due from failure to pay an estimate (advance) or from a prior month's operating expenses. The trial court did not err in awarding WMA interest under the contract.[7]

■ Appellants attack the trial court's judgment of January 13, 1993, which awarded attorney fees and costs to WMA, in several aspects. They argue they are the "prevailing party" under the accounting cause of action and are entitled to attorney fees and costs, that WMA is not entitled to attorney fees on "open account", 12 O.S.1991, § 936, that the trial court did not follow the requirements of *State ex rel. Burk v. City of Oklahoma City*, 598 P.2d 659 (Okla.1979) in calculating attorney fees, and that Appellants should not have been assessed with the costs of the Special Master.

On its own motion, the trial court appointed a Special Master pursuant to 12 O.S.1991, § 613, to conduct an accounting of the obligations between the parties relating to the operation of the wells. Appellants maintain that because their first and second causes of action requested an accounting from WMA, the trial court's appointment of a Special Master to conduct an accounting makes them the "prevailing party" for purposes of attorney fees. The record shows WMA objected to the request for accounting and desired Appellants to follow the procedures for an accounting under the JOA. The trial court found Appellants did not prevail on their equitable claim for an accounting, but that such accounting was conducted through the Special Master as an aid to the Court.

■ The prevailing party is the party who has affirmative judgment rendered in his or her favor at the conclusion of the action. *Quapaw Company v. Varnell*, 566 P.2d 164, 167 (Okla.App.1977). The trial court found Appellants have owed WMA for operating expenses at all times since WMA assumed operations. Judgment was rendered in favor of WMA for $47,286.68 for unpaid operating expenses. The trial court's appointment of a Special Master to conduct an accounting does not constitute a judgment in favor of Appellants on their accounting causes of action. The trial court properly determined Appellants were not the "prevailing party" on the accounting causes of action.

■ The trial court found WMA is entitled to attorney fees incurred in connection with its counterclaim for operating expenses on Appellants' "open account" and under 12 O.S.1991, § 940, for successfully defending the issues relating to property damage. Although WMA is not entitled to recover attorney fees in connection with its counterclaim under 12 O.S.1991, § 936, it is contractually entitled to recover attorney fees incurred in relation thereto under paragraphs I(3) and II(9) of Exhibit C of the JOAs.[8] The trial

---

7. Appellants maintain that even if the contract provides for interest, they shouldn't be required to pay interest because their failure to pay the expenses was caused by WMA's nonperformance of a condition precedent: providing "back-up" information with each JIB. Stated another way, Appellants maintain WMA's right to a non-operator's proportionate costs (and the interest thereon) is contingent on WMA supplying the non-operator with back-up. Although paragraph 2 of Exhibit C to the JOA requires the operator to substantiate JIBs with certain information, we do not find, and Appellants have not shown, how this requirement gives a non-operator the right to refuse to pay his proportionate expenses. In fact, paragraph 4 of Exhibit C provides: "Payment of any such bills shall not prejudice the right of any Non–Operator to protest or question the correctness thereof...." Further, Appellants have not established that WMA failed to supply the required back-up information. The

trial court determined WMA did not engage in any bad faith conduct as operator and that at all times, WMA acted as a reasonably prudent operator.

8. See *LPCX Corporation v. Faulkner*, 818 P.2d 431 (Okla.1991). Statute allowing for recovery of attorney fees in civil actions to recover on an open account, 12 O.S.1991, § 936, did not apply to allow recovery of attorney fees by nonoperating working interest owner under a joint operating agreement. "Open account" is defined as an unsettled debt arising from items of work and labor, goods sold and delivered, and other open transactions not reduced to writing and subject to future settlement and adjustment. *Nicholson v. Thixton*, 448 P.2d 454, 455 (Okla.1968). Although the JOA contemplates ongoing dealings between the parties, no term of the contract remained subject to future adjustment.

**612**

court correctly determined attorney fees could be assessed against Appellants.

■ The trial court granted WMA attorney fees in the amount of $47,796.25.[9] Appellants argue the requirements of *Burk* were not met because WMA's attorney fees were billed at one rate for all attorneys, $125.00/hour, and that WMA's attorney could not specifically identify the hours spent working on case no. C–88–49 and on the other consolidated cases. The trial court's findings in the judgment will be affirmed unless clearly contrary to the weight of the evidence. *Burdick v. Independent School District,* 702 P.2d 48, 55 (Okla.1985). Our review of the transcript indicates WMA presented evidence to the trial court in compliance with *Burk* which supports the trial court's award of fees.

■ Appellants maintain the trial court erred in assessing against them the Special Master's compensation and certain costs related thereto. The trial court granted WMA judgment against Appellants for $6,788.98 for the Special Master's compensation and $3,310.00 for the cost of copies provided to the Special Master. Compensation of Special Masters shall be taxed as costs. 12 O.S.1991, § 619. Under 12 O.S.1991, § 930, the trial court may award and tax costs, and apportion the same between the parties, as in its discretion it may think right and equitable.

Appellant sought an accounting in district court, although it had a right to audit WMA's accounts under the JOA. WMA resisted the appointment of a Special Master. Contrary to Appellants' assertions that the Special Master found WMA uncooperative, the Special Master testified WMA was cooperative and courteous. Appellants have not shown the trial court abused its discretion in taxing the compensation of the Special Master against Appellants. Nor have Appellants demonstrated error by the trial court is assessing the $3,310.00 in costs against them.

■ Next, Appellants argue the judgment should be reversed because the trial court denied them a jury trial. Appellants acknowledge two of their causes of action, for

an accounting, are equitable. However, they argue the presence of other legal claims entitle them to trial by jury.

■ In Oklahoma, a party's right to a jury trial is determined by the character of the action and of the issues framed by the pleadings. *Cheatham v. Bynum,* 568 P.2d 649, 650 (Okla.App.1977). In an equitable action, trial by jury is not a matter of right. *Butcher v. McGinn,* 706 P.2d 878 (Okla.1985). The presence of joined legal and equitable issues does not require a jury trial if the equitable issues are paramount or the legal issues incidental to or dependent upon the equitable issues. *Id.,* at 880. In such a case, the issues are treated as equitable for trial purposes. *Id.; Russell v. Freeman,* 202 Okla. 421, 214 P.2d 443, 444 (1949).

Appellants' petition alleged seven causes of action. The first two, for an accounting, are clearly equitable. The third, for removal as operator, is based upon allegations of fact supporting the requests for an accounting. The fourth, for damages for WMA's bad faith in operation of the wells, similarly stems from allegations concerning Appellants' accounting claims. The fifth cause of action is for injunctive relief, an equitable issue. And in the sixth cause of action, Appellants sought judgment against W. Mike Adams personally. Our review of the pleadings indicates the equitable issues are paramount in this action and Appellants have not been denied a right to a jury trial.

■ Finally, Appellants argue the trial court erred in assessing a portion of certain saltwater booster charges to the four wells in which they own an interest. They maintain there is no evidence to support charging such wells for such services and want a credit of $1,496.86. The uncontroverted evidence shows the booster system serviced seven wells, four of which were Appellants' wells. Appellants' request for a credit would mean that Appellants would not pay their proportionate costs for the booster system on their four wells. The trial court's assessment against Appellants' interests for these charges is not clearly against the weight of

---

9. The trial court specifically denied WMA's request for attorney fees incurred in connection with the prudent operator/removal of operator issues, a total of 5% of the time billed.

the evidence. *Wetzel v. Johnson,* 468 P.2d 479 (Okla.1970).

The judgment of the trial court is AFFIRMED.

JONES, P.J., and ADAMS, J., concur.