2000 OK CIV APP 63

### PENNMARK RESOURCES COMPANY, Appellant,

v.

### The OKLAHOMA CORPORATION COMMISSION; Louis Dreyfus Natural Gas Corporation; and Stonewater Holding, Inc. Now LDNG Texas Holdings, Inc., Appellees.

No. 92,559.

Court of Civil Appeals of Oklahoma, Division No. 3.

March 31, 2000.

Tim W. Green, Guthrie, Oklahoma, For Appellant.

Charles L. Helm, Helm & Boone, Oklahoma City, Oklahoma for Appellee Louis Dreyfus Natural Gas Corporation.

Chanda R. Graham, Rachel Lawrence Mor, Oklahoma City, Oklahoma, For Appellee Oklahoma Corporation Commission.

## OPINION

ADAMS, Judge:

¶ 1 After Louis Dreyfus Natural Gas Corporation (hereinafter, LDNG) refused to turn over operations of a waterflood unit to Pennmark Resources Company (Pennmark), Pennmark asked the Oklahoma Corporation Commission (the Commission) to enforce the provisions of its order creating the Northwest Flats Unit by examining the procedures followed and the results recorded in a 1997 election concerning the unit operator. The validity of that election, and the extent of the Commission's authority concerning it are at the heart of this appeal.

### Underlying Events

¶ 2 In the late 1970's, the original working interest owners (predecessors in interest to some of the parties in this appeal) entered into a contract for management of production from the Morrow "A" Sand common source of supply underlying lands in Morton County, Kansas and Texas County, Oklahoma. The Commission ultimately incorporated this contract into a unitization order.[1] The Unit Operating Agreement (the Unit Agreement) embodied in the Commission's order provided specific procedures for the selection and removal of the unit operator. Those provisions prohibit the current unit operator from voting in elections for the removal and replacement of a unit operator. The unit operator could be removed if 85 percent of the *eligible* working interest owners vote for replacement.

¶ 3 Stonewater Holding, Inc. (Stonewater) was incorporated on October 24, 1996. In early 1997, LDNG transferred 12 per cent of its ownership in the unit (out of the total of 39.18 per cent LDNG then held) to Stonewater. On December 8, 1997, documents were filed with the Oklahoma Secretary of State memorializing that in November of 1997 Stonewater had merged with LDNG Texas Holdings, Inc. (LTH). LTH is a limited partner with LDNG in a limited partnership. Following the merger, LTH, which is licensed to do business in both Oklahoma and Texas, owned interests in 12 flood water units and some 3,523 wells.

¶ 4 In December, 1997, Pennmark circulated ballots to interest owners for an election to determine if LDNG should be removed as operator and Pennmark should be selected as new operator. After the ballots were returned, Pennmark refused to include the ballot from LTH in the vote count, believing it was merely an alter ego of LDNG and could not be treated as a separate entity for voting purposes. When LDNG refused to surrender operations, Pennmark filed this proceeding. Pennmark's application asked the Commission to determine who was entitled under the Unit Agreement to vote on removal of the operator and selection of a new operator. The answer to that question determined who would be the operator of the unit. If LTH's votes should have been counted, then LDNG withstood the removal vote. If not, Pennmark had sufficient votes to oust LDNG as operator and take over operations.

¶ 5 Before the Commission, Pennmark contended the assignment from LDNG to Stonewater was improper, and LDNG and LTH could not be treated as separate owners. According to Pennmark, the transfer of ownership interests between LDNG and Stonewater was not at arms length, LTH was an

1. The unit also was the subject of proceedings in Kansas. The evidence adduced indicated that LDNG had a larger interest in the Oklahoma portion of the unit than in the Kansas portion, and that Pennmark had a larger interest in the Kansas portion than in the Oklahoma portion. The record contains a copy of the 1979 Kansas order for unitization and unit operation (which designates one of LDNG's successors as the unit operator), but does not contain any subsequent orders from Kansas concerning either the unit or the unit's operator. The jurisdiction of the Commission to issue orders affecting the portion of the unit lying in Kansas was challenged by LDNG at the hearings, but is not resolved by the order under review or addressed by either party in this appeal. A witness testified that the parties planned to file "an affiliated or associated" proceeding in Kansas after the conclusion of the Oklahoma proceedings on the application.

alter ego of LDNG, and both entities should both fall under the prohibition against a current unit operator voting in elections for removal and replacement of the unit operator.

¶ 6 In its order denying Pennmark's application, the Commission concluded Pennmark failed to sustain its burden of proof for removal of LDNG as operator. The Commission specifically concluded:

> The evidence presented by Pennmark did not establish that the parent/subsidiary corporations were so closely linked and so extricably [sic] entwined as to be effectively one entity. The showing of a common board of directors and unity of corporate purpose was insufficient to pierce the corporate veil. *Warner v. Hillcrest Medical Center*, 942[sic] P.2d 1060 [914 P.2d 1060] (Okl.App.1995). One must remember that the general rule is that a corporation is a distinct legal entity separate and apart from other legal entities or stockholders. *Gulf Oil Corp. v. State*, 360 P.2d 933 (Okl. 1961). Given the fact that Stonewater has interests in 12 other waterfloods and over 3,500 wells both in Oklahoma and Texas, tends to disprove that Stonewater was created so that its existence was a design or scheme to perpetuate fraud or to avoid the terms of the Unitization Order in this particular Unit. Thus, where the presumption is that the subsidiary is not an instrumentality or adjunct of the parent corporation; Pennmark has not prevailed.

## JURISDICTION

■ ¶ 7 Initially in response to Pennmark's application, LDNG contended the Commission lacked jurisdiction over what it said was a private rights dispute. The Commission rejected this argument, and neither party raised this issue in their briefs. However, because this Court has an obligation to examine its subject matter jurisdiction and the subject matter jurisdiction of the lower tribunal, *sua sponte*, we directed the parties to address the jurisdictional question.[2]

¶ 8 LDNG again argues this was a private rights dispute and that jurisdiction was in the district courts, not at the Commission. According to LDNG, allowing the Commission to determine this controversy violates 52 O.S.1991 § 287.4, which specifies that the Commission shall not designate the unit operator. Pennmark argues the issue is not whether the Commission could select the operator but whether the procedures employed complied with the order of the Commission for the unit. The Commission determined that it had authority to construe and clarify its order and that what was before it was a question involving a clarification of the process used when electing an operator, not the designation of the operator. We agree that clarification of an order was the issue presented and the one that the Commission addressed.

■ ¶ 9 The Commission has authority, which is continuous in nature and which flows from entry of the initial order, to clarify its own orders. *Nilsen v. Ports of Call Oil Company*, 1985 OK 104, 711 P.2d 98; 52 O.S.1991 § 139 and § 287.2. This is precisely the relief requested by Pennmark in its application.[3] The operator must be elected as provided for in the Unit Agreement. To accomplish that end, the parties needed to know who was eligible to vote according to the order of the Commission, and that determination required clarification of an order of the Commission, an action within the power and authority of the Commission.

¶ 10 This matter is distinguishable from the problem posed in *Atlantic Richfield Company v. Tomlinson*, 1993 OK 106, ¶ 28, 859 P.2d 1088, 1096, wherein the Court noted that "the instant case involves a dispute over *ownership* of certain oil and gas interests, not a dispute over *rights and equities* of

---

2. The Commission waived its right to file an Answer Brief on the basic appeal but filed a brief on the jurisdictional issue.

3. *Samson Resources Company v. Corporation Commission*, 1985 OK 31, 702 P.2d 19, does not require a different result. The parties in that matter entered into a voluntary joint operating agreement, not an agreement which was incorporated into, and thereby superseded by, a unitization order of the Commission.

interest owners within a drilling and spacing unit," (emphasis in original), and reiterated that where title is at issue, jurisdiction over controversies lies with the district court. While perhaps inartfully stated at times,[4] Pennmark's challenge does not attack LTH's ownership interest, but only whether that interest, given LTH's alleged domination by LDNG, should be allowed to vote on the removal of its parent ·corporation as unit operator. The Commission had jurisdiction of Pennmark's application.

## STANDARD OF REVIEW

 ¶ 11 Our review of Commission orders is generally restricted to. determining whether the findings and conclusions are sustained by law and substantial evidence. *Samson ˊResources Company v. Oklahoma Corporation Commission,* 1987 OK 73, 742 P.2d 1114 (construing Okla. Const. Art. 9, § 20). When performing such a review, the Court does not weigh the evidence on appeal, but only determines whether the supporting evidence possesses substance and relevance. *Currey v. Corporation Commission,* 1979 OK 89, 617 P.2d 177. This process does not entail comparing the evidence of the parties, but includes determining if the evidence supporting the order furnishes a substantial basis of facts from which the issue could be reasonably resolved. Substantial evidence is something more than a scintilla and means evidence possessing something of substance and of relevant consequence such as carries with it a fitness to induce conviction, even though it may be evidence about which reasonable men may fairly differ on the point of establishing the case. *Union Texas Petroleum, A Div. of Allied Chemical Corp. v. Corporation Commission,* 1981 OK 86, 651 P.2d 652. The determination of substantial evidentiary support requires measurement of

the supportive points to determine whether the criterion of substantiality is present, not the weighing of the evidence. *Central Oklahoma Freight Lines v. Corporation Commission,* 1971 OK 57, 484 P.2d 877.

## Alter Ego Inquiry

¶ 12 The designation of an operator is required to be "by a vote of the lessees in the unit in a manner provided in the plan of unitization and not by the Commission." 52 O.S.Supp.1995 § 287.4(a). This text has existed in the law of Oklahoma since enactment effective May 26, 1951. Pennmark argues that LTH is an alter ego or instrumentality of LDNG and that the two should be treated as one entity for voting purposes.

¶ 13 Pennmark cites several cases for the proposition that separate corporate existence may be disregarded where that separate existence is used in a scheme to permit one corporation to evade its "just obligations."[5] Pennmark identifies the "obligation" in this instance as that of the operator not to vote in removal and replacement elections. LDNG argues that nothing in the Unit Agreement prevents assignment of any of its interest and that as a consequence LTH's interest should be accorded voting rights. We decline to adopt the analyses of either Pennmark or LDNG.

¶ 14 The question before the Commission was not whether an "obligation" was owed by any of the parties or whether an interest was assignable—it was a question of who was entitled to vote under the Unit Agreement which was part of an order of the Commission order. To answer that question, the Commission needed to determine if LTH was a separate owner who was entitled to vote.

¶ 15 The Commission's order cites ownership in other properties as showing a lack of

---

**4.** Although Pennmark occasionally cast its contentions as suggesting the assignment was invalid, such as arguing the absence of consideration, the record makes it clear that Pennmark's arguments were not based on the *validity* of the assignment but on whether Stonewater(later LTH) and LDNG should be treated as one and the same under the Unit Agreement.

**5.** *Oliver v. Farmers Insurance Group of Companies,* 1997 OK 71, 941 P.2d 985; *Frazier v. Bryan*

*Memorial Hospital Authority,* 1989 OK 73, 775 P.2d 281; *Mid–Continent Life Insurance Company v. Goforth,* 1943 OK 244, 193 Okl. 314, 143 P.2d 154; *Warner v. Hillcrest Medical Center,* 1995 OK CIV APP 123, 914 P.2d 1060; *Thomas v. Vertigo, Inc.,* 1995 OK CIV APP 45, 900 P.2d 458; *Oklahoma Oil & Gas Exploration Drilling Program 1983–A v. W.M.A. Corporation,* 1994 OK CIV APP 11, 877 P.2d 605.

a scheme or design to perpetuate fraud or to avoid the terms of the Unit Agreement. The order finds that Pennmark did not establish that LTH and LDNG were "so closely linked" and "entwined as to be effectively one entity." The Commission's analysis recited that the questions in the case were "close calls," and that because it was "a draw," Pennmark had failed to meet its burden of proof under the evidence adduced. The Commission found that there was a proper assignment, and that LTH was "a proper owner to vote on the question of unit operator." Our task is to determine if the record reflects that the Commission's findings and conclusions are sustained by law and substantial evidence.

█ ¶ 16 Corporate distinctions may be disregarded and two separate entities may be treated as one if one corporation is but an instrumentality or agent of another. *Frazier v. Bryan Memorial Hospital Authority*, 1989 OK 73, 775 P.2d 281. Factors to be considered in determining if an entity has sufficient control over another entity to justify treating one as the instrumentality of the other for the purpose of a given transaction were set forth in *Frazier v. Bryan Memorial Hospital Authority*, 1989 OK 73, ¶ 17, 775 P.2d at 288:

> 1) the parent corporation owns all or most of the subsidiary's stock, 2) the corporations have common directors or officers, 3) the parent provides financing to its subsidiary, 4) the dominant corporation subscribes to all the other's stock, 5) the subordinate corporation is grossly undercapitalized, 6) the parent pays the salaries, expenses or losses of the subsidiary, 7) almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter, 8) the parent refers to its subsidiary as a division or department, 9) the subsidiary's officers or directors follow directions from the parent corporation and 10) legal formalities for keeping the entities separate and independent are observed.

In addition to these factors, commonality of purpose also may be considered. *Oliver v. Farmers Insurance Group of Companies*, 1997 OK 71, 941 P.2d 985.

█ ¶ 17 LDNG's motive is not determinative when analyzing whether the corporate veil should be pierced and the corporate structure ignored. Although several cases have discussed fraud as a potential basis for ignoring formal corporate identity, it is not necessary for fraudulent intent to be present for the alter ego theory to be applied to pierce the corporate veil. *E.g., TPQ Investment Corporation v. State ex rel. Oklahoma Tax Commission*, 1998 OK 13, 954 P.2d 139, (alter ego analysis used to determine tax credit eligibility); *Alfalfa Electric Cooperative, Inc. v. First National Bank & Trust Company of Oklahoma City*, 1974 OK 98, 525 P.2d 644 (corporate affairs of nonprofit development company created by electric cooperative so conducted that company was instrumentality of cooperative, rendering borrower and pledgor of cooperative assets the same); *Harvey v. National Bank of Commerce of Tulsa*, 1972 OK 112, 504 P.2d 424 (bank's president, board chairman and principal stockholder in "family-controlled corporation" held to be the bank's alter ego at the time agreement made to pay a pension); and *Sautbine v. Keller*, 1966 OK 209, 423 P.2d 447, (doctrine applied not only for fraud or wrong but also to protect rights of third persons and accomplish justice).

¶ 18 LDNG admitted it realized in 1996 that it was in danger of losing its status as operator when it became aware that the interest of another party was for sale. Because of the way the Unit Agreement was worded, it would be against its interest to purchase additional rights in the unit. LDNG also decided that it was better to reduce its ownership percentage, and it decided to transfer some of its interest to LTH (then Stonewater). However, this business motivation, standing alone, does not require that the corporate veil be pierced.

█ ¶ 19 Control following the transfer, as reflected in the factors cited in *Frazier* and *Oliver*, is the essential issue. We therefore compare those factors with the evidence adduced, not to weigh the evidence or compare it, but to determine if the evidence supporting the order of the Commission furnishes a substantial basis of facts from which

the issue could be reasonably resolved. We conclude that it does not.

¶ 20 According to the evidence, LTH is a wholly owned subsidiary of LDNG and the entities have a commonality of purpose (*i.e.* control of liability arising from unit operations, increasing unit production, limiting environmental problems). These factors would not *alone* be sufficient to establish alter ego status. However, the evidence also shows that a director of LDNG, who was also its president and chief executive officer, was the president and sole director of LTH. All of LTH's other corporate officers were also officers and/or directors of LDNG. A prior officer of LTH left its service when he ended employment with LDNG. LDNG's witness acknowledged that the same people who controlled LDNG controlled LTH and that the people making LDNG's business decisions are exactly the same people as those making decisions about LTH's business.

¶ 21 The Commission found Pennmark failed to produce sufficient evidence to establish that the parent/subsidiary corporations were so closely linked and so inextricably intertwined as to be effectively one entity. LTH may not have been "intertwined" in LDNG, but via its control, LDNG clearly was intertwined in the management and direction of LTH. Other indicia of control listed in *Frazier* and *Oliver* are unaddressed by this record, primarily issues of the subsidiary's financial independence. However, financial interdependence was not at issue and, while such evidence may tend to show control where other evidence of control is lacking, here the element of control was well established by other factors. LTH had no employees and paid LDNG a monthly fee for using LDNG employees. The LDNG employees working for LTH were paid directly by LDNG and remained subject to its control no matter which entity they were performing services for at any given moment.

¶ 22 The record does show that legal formalities were observed in that separate tax numbers and tax payments were made, although LTH and LDNG shared a common street address. However, there was no allegation here, as there often is when an individual is the sole shareholder and management of a corporation, that the corporate nature of LTH was ignored. Rather, that corporate structure was preserved and controlled by LDNG. As to the factors relevant to the situation presented, *i.e.*, deciding how to cast the vote on the operator ballot, there was overwhelming evidence that LTH was an instrumentality of LDNG and no evidence that it was not.

¶ 23 The order of the Commission lacks support in substantial evidence and is reversed. The matter is remanded for entry of an order consistent with the views expressed.

REVERSED AND REMANDED

¶ 24 HANSEN, V.C.J., and JOPLIN, J., concur.