Willa WARNER, Linda Jones, and Merle Levitt, Personal Representatives of the Estate of Norma Levitt, Deceased, Plaintiffs,

v.

HILLCREST MEDICAL CENTER, a corporation, Robert Morton, M.D., Christine Jones, CRNA, and Tulsa Anesthesiologists, Inc., an Oklahoma corporation, Defendants,

and

Hillcrest Healthcare Corporation, Hillcrest Medical Center Foundation, Hillcrest Real Estate, Inc., Hillcrest Service Company, Frederick Jones, M.D., Gary Breipohl, M.D., Jonathan Anthony, M.D., Robert Spohr, M.D., Thomas Singletary, M.D., Harold Voss, M.D., Dan Wiesemeyer, M.D., Jerry Puls, M.D., Douglas Hubner, M.D., Duane Brothers, M.D., Jerry L. Puls, M.D., Inc., and South Utica Pathology Laboratories, Inc., Appellees,

and

Wilkinson and Monaghan, a Professional Corporation, and Bill V. Wilkinson, Appellants.

No. 83555.

Court of Appeals of Oklahoma, Division 4.

Sept. 26, 1995.

Rehearings Denied Nov. 20, 1995.

Certiorari Denied April 1, 1996.

W. Michael Hill, Edward J. Main, Secrest, Hill & Fulluo, Tulsa, for Defendants/Appellees Hillcrest Healthcare Corporation, Hillcrest Medical Center Foundation, Hillcrest Real Estate, Inc., and Hillcrest Service Company.

Michael P. Atkinson, Galen L. Brittingham, Marthanda J. Beckworth, Kirsten E. Pace, Atkinson, Haskins, Nellis, Boudreaux, Holeman, Phipps & Brittingham, Tulsa, for Defendant/Appellee Frederick Jones, M.D.

Joseph A. Sharp, John H.T. Sheridan, Karen M. Grundy, Best, Sharp, Holden, Sheridan, Best & Sullivan, Tulsa, for Appellees Gary Breiphol, M.D., Jonathan Anthony, M.D., Robert Spohr, M.D., Thomas Singletary, M.D., Harold Voss, M.D., Dan Wiesemeyer, M.D., and Duane Brothers, M.D.

Stephen J. Rodolf, Karen L. Callahan, Barkley, Rodolf & McCarthy, Tulsa, Tony Jack Lyons, Lyons & Lyons, Pryor, for Defendants/Appellees Jerry Puls, M.D., Douglas Hubner, M.D., Jerry L. Puls, M.D., Inc., and South Utica Pathology Laboratories, Inc.

Bill V. Wilkinson, Wilkinson & Monaghan, Inc., Tulsa, Murray E. Abowitz, Abowitz, Welch & Rhodes, P.C., Oklahoma City, for Appellants Wilkinson & Monaghan, Inc. and Bill V. Wilkinson.

*OPINION*

GOODMAN, Presiding Judge.

Appellants Wilkinson & Monaghan, a Professional Corporation (law firm), and Bill V. Wilkinson, an individual, appeal from the trial court's order awarding sanctions to multiple defendants against the law firm and Wilkinson.

I

*Facts*

Wilkinson and his law firm (hereinafter Wilkinson) were retained by the personal representatives of the estate of Norma Levitt to pursue a medical malpractice claim. Norma Levitt died on the operating table at Hillcrest Medical Center in Tulsa, Oklahoma,

on November 8, 1989, following successful hip replacement surgery. A nurse anesthetist gave Levitt a unit of Levitt's own blood which had been warmed in a microwave oven located in the employees' lounge.[1] Wilkinson alleged the negligent introduction of this blood into Levitt's system was a direct cause of her death minutes later. The defendants argued that Levitt died from a blood clot, rather than the hemolyzed blood. Wilkinson's first petition named only Hillcrest Medical Center as defendant. The petition was amended over 15 months later, on November 8, 1991, to include twenty additional individual and corporate defendants.[2]

A jury trial was held, following more than three years of discovery. The trial lasted over three weeks. After seventeen days of trial, the plaintiffs rested. The trial court sustained demurrers by Drs. Jones, Breipohl, Anthony, Spohr, Voss, Wiesemeyer, Puls, Hubner and Brothers. Demurrers on behalf of South Utica Pathology Lab, Jerry L. Puls, M.D., Inc., Hillcrest Health Care Corporation, Hillcrest Real Estate Corporation, Hillcrest Medical Center Foundation, and Hillcrest Service Corporation were also sustained. Demurrers by Hillcrest Medical Center, Drs. Morton and Singletary, Christine Jones, C.R.N.A., and Tulsa Anesthesiology, Inc., were overruled.[3] The case was submitted to the jury against Dr. Morton, Christine Jones, C.R.N.A., Tulsa Anesthesiology, Inc., and Hillcrest Medical Center, Inc., only. A defendants' verdict was returned.

Wilkinson and the law firm filed a motion for new trial. In the meantime, Levitt's estate fired Wilkinson and the law firm, and retained other counsel. The new counsel was able to settle the case against the final four remaining defendants in exchange for foregoing an appeal. None of the issues raised at trial are before us today. The evidentiary and procedural rulings made by the trial judge are not raised on appeal. We will therefore indulge in the presumption that those rulings were correct.

Following the confidential settlement, the non-settling defendants who had earlier been dismissed by the trial court applied for sanctions against Wilkinson and the law firm, alleging violations of 12 O.S.1991 § 2011. Following a two-day hearing, the trial court entered an order on April 11, 1994, which consisted of detailed findings of fact and conclusions of law. The order gave judgment in favor of the sixteen moving defendants in the sum of $12,500 per defendant, for a total judgment against Wilkinson and the law firm of $200,000.

It is from this order Wilkinson and the law firm appeal. Wilkinson's petition in error sets out fifty-three propositions of error. Wilkinson's brief preserves but one: whether or not the sanctions levied were an abuse of the trial court's discretion. Except for those propositions of error set out in the petition in error which are included within the single briefed issue, the balance of the propositions of error are deemed waived. *Hadnot v. Shaw*, 826 P.2d 978 (Okla.1992); *American First Abstract Co. v. Western Information Systems, Inc.*, 735 P.2d 1187 (Okla.1987); *State ex rel. Remy v. City of Norman*, 642 P.2d 219 (Okla.1981). All other allegations of error which occurred during the course of the trial itself are deemed waived, as no appeal from the jury verdict has been perfected.

## II

### Section 2011 Sanctions

The applicable portions of 12 O.S.1991 § 2011,[4] read:

---

1. Heating blood in this manner destroys the red blood cells, resulting in "gross hemolysis" of the blood, releasing large amounts of potassium. Excessive potassium, when introduced into the body, is often fatal. The practice of warming Intravenous (IV) fluids, other than blood, in the microwave was an accepted practice at Hillcrest Medical Center, as reflected in its written procedures.

2. Dr. Kim Zarintash, M.D., was later dismissed without prejudice.

3. Dr. Singletary's demurrer was later reconsidered and sustained, leaving only four defendants.

4. Section 2011 is adopted almost verbatim from Fed.Rules Civil Proc. Rule 11, 28 U.S.C.A.

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

■ The appellees essentially contend that Wilkinson violated § 2011 either by improperly naming them in the lawsuit without any basis in law or fact or, presuming such a basis in law or fact initially existed, Wilkinson was unable to develop sufficient evidence to maintain a viable cause of action against them, at which time he had the obligation to dismiss them from the lawsuit. Title 12 O.S. 1991 § 2011, is adopted from its federal counterpart, Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A. Therefore, we are permitted to review appropriate federal caselaw to aid in our interpretation and application of this rule to the facts in this case. *Unit Petroleum Co. v. Nuex Corp.*, 807 P.2d 251 (Okla.1991).

### III

#### Standard of Review

■ The standard of review is whether the trial court abused its discretion in imposing sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Broadwater v. Courtney*, 809 P.2d 1310 (Okla.1991); *Berko v. Willow Creek I Neighborhood Ass'n, Inc.*, 812 P.2d 817 (Okla.Ct.App.1991). Whether or not the acts of an attorney are done in good faith is no longer the test. " '[T]he new test repre-

sents an intentional abandonment of the subjective focus of [§ 2011] in favor of an objective one.' 'Simply put, *subjective good faith no longer provides the safe harbor it once did.*' 'There is no room for a pure heart, empty head defense under [§ 2011].' " *First National Bank and Trust Company of Vinita v. Kissee*, 859 P.2d 502, 512 (Okla.1993) (emphasis in original) (footnotes omitted). "Rule 11 *requires* lawyers to think first and file later, on pain of personal liability." *Stewart v. RCA Corp.*, 790 F.2d 624, 633 (7th Cir.1986). There is a duty to dismiss lawsuits when it becomes apparent there is no viable claim against a named defendant. *See Flip Side Productions, Inc. v. Jam Productions Ltd.*, 843 F.2d 1024 (7th Cir.1988). The advisory committee notes to Fed.Rules Civ. Proc.Rule 11, 28 U.S.C.A., lend insight to the application of sanctions.

> The rule continues to require litigants to "stop-and-think" before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable.... [This duty continues and is] not measured solely as of the time [the allegations] are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.... Moreover, if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention.

■ The imposition of sanctions, on the other hand, should not be used to punish parties with unpopular claims.

> The standard for bad faith awards is stringent, for "[o]therwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court." ...
>
> The defendant seeking fees must not only prevail on the merits, but must also "show plaintiff pursued the litigation in bad faith or brought a frivolous, unreasonable, or groundless action." ...

Simply because the facts are found against a party "does not by itself prove that threshold of irresponsible conduct for which a penalty assessment would be justified." ... A nonprevailing party should not be penalized for merely prosecuting or defending a lawsuit. (Citations omitted.)

*U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1241 (10th Cir.1988) (citations omitted).

Title 12 O.S.1991 § 2011, encourages colorable, yet novel, claims by prohibiting sanctions for "a good faith argument for the extension, modification, or reversal of existing law."

With these guidelines in mind, we proceed to analyze the facts and law.

IV

*Allegations of Violations of
12 O.S.1991 § 2011*

Wilkinson made allegations against twenty-one defendants, sixteen of whom seek sanctions. These sixteen defendants can be categorized into three different groups, each with a distinct theory of negligence lodged against it. We will examine the allegations made against each group of defendants, determine if Wilkinson violated § 2011 in pursuit of claims against that group, and make a final determination as to whether the trial court's entry of sanctions on behalf of that group was properly supported by the evidence.

A review of the voluminous record reveals certain facts common to all three groups. One and one-half years elapsed between the filing of the plaintiffs' original and amended petitions. Over 30 depositions were conducted, and scores of documents were exchanged during that time. Wilkinson testified at the hearing on sanctions that he conducted extensive research and engaged in various conversations with other attorneys and medical experts prior to filing suit. At the sanctions hearing, none of the defendants questioned Wilkinson as to what specific inquiries had been made prior to the filing of his amended petition. In fact, many of the defense counsel who testified against Wilkinson merely "assumed" that Wilkinson conducted no pre-

filing inquiry. None of them claimed to have any personal knowledge of what prefiling research was in fact done. Yet, much of the focus of their quest for sanctions was based on the alleged lack of a prefiling investigation sufficient to justify the filing of a claim against the defendants.

 As we interpret § 2011 and the caselaw regarding sanctions, we must make an objective determination as to whether Wilkinson had a reasonable basis to include a particular defendant and then determine whether, if such an initial basis existed, there was sufficient evidence produced during the course of discovery to keep the defendant in the lawsuit. In light of the cases set out above, it is not relevant to our analysis whether Wilkinson successfully proved his allegations at trial, or whether he was even able to introduce evidence at trial in support of such allegations. Our concern is whether the attorney had a reasonable, objectively ascertainable basis to file and maintain the allegations made against the defendants. If at any point in this inquiry we find either that Wilkinson had no reasonable basis in fact or law to initially file the claim, or that after filing the claim he could not produce evidence which would reasonably support the continuation of the claim, we will not hesitate to affirm the trial court's imposition of proper sanctions. However, we will not uphold sanctions for ineffective or even poor presentation of an otherwise viable claim. Sanctions are not penance for the sins of being on the losing side of a ruling or presenting a novel theory of recovery if it is supported by a good faith argument for the extension, modification or reversal of existing law.

*A. Claims against the Hillcrest entities*

 Wilkinson and the law firm filed a petition against Hillcrest Medical Center (HMC) on July 17, 1990. On November 8, 1991, Wilkinson amended his petition to include Hillcrest Healthcare Corporation, Hillcrest Medical Center Foundation, Inc., Hillcrest Real Estate, Inc., and Hillcrest Service Company. Wilkinson's amended petition alleged that all these corporations "operate a

medical facility in Tulsa County known as Hillcrest Medical Center."

According to the affidavit of the President and Chief Executive Officer of both Hillcrest Health Care Corporation and Hillcrest Medical Center, Hillcrest Health Care Corporation is the parent company of all the named Hillcrest defendants, including Hillcrest Medical Center. All of these entities, including Hillcrest Medical Center, are "wholly-owned [sic] subsidiaries of Hillcrest Health Care Corporation, an Oklahoma not-for-profit corporation." It is undisputed that only Hillcrest Medical Center rendered any medical treatment to Levitt. For purposes of this opinion, the parent corporation, Hillcrest Health Care Corporation and all its subsidiaries, except for Hillcrest Medical Center, will be referred to as the Hillcrest Entities.

Wilkinson's theory of recovery against Hillcrest Medical Center (HMC) was based on alleged negligence in the supervision of its employees or those medical service providers who, while technically not employed by HMC, were, nevertheless, under its direction and control. The jury rendered judgment in favor of HMC on this theory. HMC did not request sanctions against Wilkinson. Any issues surrounding the claims against HMC are not before us.

Wilkinson's theory of recovery against the Hillcrest Entities was based on the allegation that the Entities were the alter ego corporations of HMC set up to receive assets diverted to them by HMC. Wilkinson stated his theory of recovery as follows: "We have alleged agency. The truth of the matter is that there is an interwoven, interconnecting relationship between all of the defendants which will render them liable and share ownership of equipment and all kinds of different things...."

This theory was subjected to repeated evidentiary attacks by the Hillcrest Entities, which first filed a Motion to Drop Misjoined Parties on December 5, 1991. In response, Wilkinson successfully defeated this motion by referring to the allegations contained in his amended petition, essentially arguing that each separate, named entity was in fact an agent of the others. Wilkinson seems to argue that each of the Hillcrest Entities was in fact an agent of the other named individual defendant doctors and that each Hillcrest Entity "maintained and exercised the right to control the actions and conduct of all such persons [the allegedly negligent doctors] and they are vicariously liable for their actions under the doctrine of respondeat superior." At a hearing on this motion, Wilkinson was told by the court that "for an attorney to continue to sign pleadings and sue people that don't need to be sued and shouldn't be sued would be a violation of the rules. So if that develops, I'll expect you to take care of that, or I'll have to. If it doesn't develop, that's fine too."

The Hillcrest Entities later filed a motion for summary judgment on August 31, 1992, again seeking their dismissal. In his response to the motion, Wilkinson presented an affidavit by Dr. Miller–Hardy, Ph.D., which indicated that she would testify concerning the relationship between the Hillcrest Entities and HMC in a manner which would be sufficient to support Wilkinson's allegations of agency. The affidavit of Miller–Hardy merely states: "I believe the other entities had the right to and did exercise control over Hillcrest Medical Center...." There is no further proof of an agency relationship other than this "belief." At the hearing on the motions for summary judgment, the trial court inquired about the depth of Miller–Hardy's knowledge as it pertained to the Hillcrest Entities. Wilkinson assured the court of Miller–Hardy's ability to prove agency between HMC and the Hillcrest Entities. The court said, "My question is: Have you done that in good faith and do you know that she knows?" Wilkinson replied, "Yes sir. Yes to both of those. I have done it in good faith. Yes, sir, I do know that she knows." Wilkinson went on to say "we will show it in the witness stand and to the jury." The court warned Wilkinson that "[Y]ou better be able to do so ... or I will give you sanctions." Wilkinson assured the court he had sufficient evidence to support his claims. The trial court left the Hillcrest Entities in the lawsuit based upon Wilkinson's promise to produce evidence.

At trial, however, Wilkinson did not call Miller–Hardy to testify. Instead, Wilkinson

presented the trial testimony of Dr. Wright, who testified there was "commonality" of personnel between the board of directors of the various Hillcrest Entities and HMC. The focus of Wright's testimony was on the accreditation process and the adoption of certain standards of care at Hillcrest Medical Center, but had little or nothing to do with the Hillcrest Entities or their relationship to each other. The trial court did not permit Wright to testify further concerning the interrelationship between Hillcrest Medical Center and the Hillcrest Entities, as it was clear the witness' familiarity with those entities was limited, and thus lacked sufficient foundation to be used as a basis of expert opinion. While Wilkinson's brief on appeal claims this evidence was improperly excluded, that allegation of trial error has been waived. We are left with a record containing the single bare allegation that the various Hillcrest Entities have some common board members. We have reviewed the deposition transcript of Dr. Wright taken June 27, 1992, which was opened and reviewed by the trial court. The pre-trial testimony of Dr. Wright is critical of some of the Anesthesiologists, but contains no opinions on the relationship between Hillcrest Medical Center and the Hillcrest Entities. Indeed, Wilkinson has not pointed out any such references to this court in any of his briefs.

As we understand Wilkinson's theory of liability, based on the evidence in the record and Wilkinson's testimony at the sanctions hearing, the focus of this theory was two-fold: that the Hillcrest Entities were to be held liable for the negligent acts of HMC, a sibling subsidiary corporation; and that Hillcrest Health Care Corporation was responsible as a parent corporation for the negligent acts of its subsidiary, HMC, by virtue of respondeat superior or an agency relationship. We find no basis in law for such allegations. It is clear that had one of the subsidiaries committed a tort, the parent company, presuming proof the subsidiary was in fact an alter ego of the parent, could also be held accountable.[5] The liability would not flow, however, to other sibling subsidiary corporations. The doctrine of respondeat superior has its roots in master-servant/employer-employee cases, not corporate responsibility. Agency is likewise an employer/employee doctrine, but it requires proof of both an agent and a principal and an express or implied agreement for the former to act on behalf of the latter. Wilkinson has failed to produce any evidence to prove who was the principal and who was the agent or the existence of such a relationship. There is no evidence which would establish that the parent/subsidiary corporations were so closely linked and so inextricably intertwined as to be effectively one entity. The showing of a common board of directors and a unity of corporate purpose is insufficient to pierce the corporate veil. *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 178 Okla. 15; 61 P.2d 645 (1936). We have meticulously reviewed the record to find evidence introduced by Wilkinson to prove his allegations of intercorporate agency and an agency relationship between HMC, the Hillcrest Entities, and the individual defendant physicians as alleged by Wilkinson. We find no objective convincing evidence of such.

Having reviewed the voluminous trial court record, the briefs of the parties, the affidavits and evidence, and applying the law set out above, we are led to the inescapable conclusions that Wilkinson's and the law firm's allegations against the Hillcrest Entities were made without basis in fact, and that Wilkinson's repeated and successful attempts to keep them in the lawsuit after it was

---

**5.** The general rule is that a corporation is a distinct legal entity separate and apart from other legal entities or stockholders. *Gulf Oil Corp. v. State*, 360 P.2d 933 (Okla.1961). However, this legal fiction may be avoided if it is established that the separate corporate existence is a design or scheme to perpetuate a fraud or where a corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another. *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 178 Okla. 15, 61 P.2d 645 (1936); *Oklahoma Oil & Gas Exploration Drilling Program 1983-A v. W.M.A. Corp.*, 877 P.2d 605 (Okla.Ct.App.1994). "Oklahoma permits the court to disregard the corporate entity if used, (1) to defeat public convenience, (2) justify wrong, (3) to perpetrate fraud whether actual or implied, or (4) to defend crime." *Robertson v. Roy L. Morgan Production Co.*, 411 F.2d 1041, 1043 (10th Cir.1969) (citations omitted). *See also Matter of Estate of Rahill*, 827 P.2d 896 (Okla.Ct.App.1991).

apparent that there was no basis in law or fact for their being there was a violation of 12 O.S.1991 § 2011. While we find no proof by the Hillcrest Entities that Wilkinson failed to conduct a pre-filing investigation, we do find there is no objective, reasonable basis to conclude that Wilkinson had a colorable claim against these corporate entities. Assuming arguendo there initially existed such a basis, it is clear that Wilkinson produced no evidence to support the continuation of the lawsuit against the Hillcrest Entities.

■■■ We have examined the evidence presented by the Hillcrest Entities in support of their quest for sanctions, and find the evidence supports the trial court's findings of fact and conclusions of law, and the trial court properly awarded sanctions against Wilkinson and his interest in the law firm in favor of the Hillcrest Entities.[6] Wilkinson does not preserve as an issue the amount of sanctions; merely the imposition of them. We therefore affirm the award of sanctions in the amount of $12,500 each to Hillcrest Health Care Corporation, Hillcrest Medical Center Foundation, Hillcrest Service Company and Hillcrest Real Estate, Inc.

### B. Claims against Anesthesiologists

■■■ Wilkinson's amended petition added as defendants the following anesthesiologists: Drs. Morton, Jones, Breipohl, Anthony, Spohr, Singletary, Voss, Wiesemeyer, and Brothers (Anesthesiologists), and Tulsa Anesthesiologists, Inc. The Anesthesiologists were the individual shareholders of Tulsa Anesthesiologists, Inc. Of these individuals, only two had any significant connection with the Levitt operation: Dr. Morton, who actually administered or supervised the giving of

anesthesia to Mrs. Levitt, and Dr. Jones, who attempted resuscitation of Mrs. Levitt following the blood transfusion.[7] Of the remaining individual doctors, none ever had any direct connection with Levitt's medical care.[8] Wilkinson alleged that because of substandard training by the individual anesthesiologists, it was common for the nurses and staff to warm IV solutions in a microwave oven, rather than use the slower, but safer, blood warmers that were available. It was only a matter of time, Wilkinson alleged, that these same people would warm blood in a microwave, as well as IV solutions. Wilkinson presented evidence that the practice of microwaving IV solutions was the topic of a study at Hillcrest. In fact, Abbot Laboratories, the manufacturer of the IV solutions, mailed Hillcrest a letter containing a statement that microwaving the solutions was not recommended. Wilkinson's evidence showed that any of the Anesthesiologists had the authority to question and stop the practice of microwaving IV solutions at Hillcrest. Wilkinson contends they had an affirmative duty to do so. The fact none of the Anesthesiologists questioned or stopped this practice from occurring, despite their superior knowledge that the practice was questionable, became the basis for Wilkinson's allegations against all the Anesthesiologists, despite their lack of a direct doctor/patient relationship to Mrs. Levitt. Wilkinson alleged that the Anesthesiologists violated a duty to Mrs. Levitt by allowing a dangerous condition to exist which they were in a position to correct but failed to do so.

The plaintiffs' expert witness, Dr. Larson, an anesthesiologist and professor of anesthe-

---

6. The trial court awarded sanctions "against Mr. Bill V. Wilkinson personally, and against his interest within the law firm of Wilkinson & Monaghan." The trial court correctly noted that sanctions levied against the law firm itself are prohibited in Oklahoma. *Unit Petroleum Co. v. Nuex Corp.*, 807 P.2d 251 (Okla.1991).

7. Additionally, Dr. Singletary assisted Dr. Jones during the resuscitation attempt, and Dr. Voss performed the pre-operative evaluation of Norma Levitt.

8. In fact, Dr. Spohr was on vacation the date of the surgery, and Dr. Brothers had retired from

the Corporation forty-five days preceding the operation. At first glance, it may appear Dr. Brothers was never a proper party to the suit. Because, however, we understand Wilkinson's theory of liability to be critical not only of the IV warming procedures themselves, but also of the role the professional corporation of anesthesiologists played in the development of standards resulting in those procedures, and because Dr. Brothers was a shareholder and participant in the Corporation at the time those IV warming protocols were adopted, Dr. Brothers is arguably causally connected to Levitt's death under the dangerous condition theory urged by Wilkinson.

sia and neurosurgery from Stanford University, testified in his deposition on August 14, 1992, that all the Anesthesiologists in general, and Dr. Morton in particular, had deviated below a national standard of care by not prohibiting the warming of blood in a microwave oven. At trial, this witness was again asked whether all the Anesthesiologists were negligent for their failure to intervene. The Anesthesiologist defendants objected, claiming such criticisms were a surprise as those criticisms had not been raised in the "discovery" deposition. Wilkinson responded by claiming the witness was in fact critical of all the individual physicians in his deposition. Indeed, the trial court recognized that "this witness gave some broad things in his deposition that could have been delved into by defense counsel if they individually had any responsibility or did anything wrong in the cause—in causing the death of Norma Levitt." After repeated objections were made by defense counsel that they were surprised by Dr. Larson's specific criticisms of each Anesthesiologist, the trial court again noted that "[H]is opinions were to all anesthesiologists. If you want to know who 'all' was, you could have asked in the deposition, but I want it related to this case, ·not just some broad thing out there." Larson went on to criticize the inadequate training of the nurse anesthetist and the circulating nurse. Dr. Larson was asked the following question:

> Q. (by Mr. Wilkinson) What do you believe that Dr. Fred Jones should have done that he did not do with regard to Norma Levitt, please?
>
> [objections by Dr. Jones' counsel overruled]
>
> A. Dr. Jones failed to recognize the potential risks of warming IV solutions in the standard microwave in the coffee room in the lounge.
>
> He failed to recognize the flaws in the study that was done of IV solutions and the temperatures after microwaving. And I have a series of flaws in that study that Dr. Jones should have known would invalidate the study and make it meaningless with respect to the microwaving of IV solutions.

Although not as specific, this answer reflects the criticisms Larson had against each of the individual Anesthesiologists.

Following the plaintiffs' case in chief, the demurrers of all the Anesthesiologists, except Dr. Morton and Tulsa Anesthesiologists, Inc., were sustained. The jury returned a verdict in favor of Dr. Morton and Tulsa Anesthesiologists, Inc.

Because Dr. Morton and Tulsa Anesthesiologists, Inc.,[9] did not seek sanctions, we do not address the evidence relating to their actions. We are primarily concerned with whether or not Wilkinson had any objective basis to maintain an action against the other Anesthesiologists.

At the sanctions hearing, the Anesthesiologists argued that because there was no doctor-patient relationship between them and Mrs. Levitt they were improperly brought into the suit. They contend "it is painfully obvious that Wilkinson had no viable theory upon which to sue these individual anesthesiologists, nor did he ever have the evidence necessary to maintain a claim against [them]." We disagree.

Section 2011 specifically contemplates actions that are "well grounded in fact and [are] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that [are] not interposed for any improper purpose...." Wilkinson sought to hold the non-treating Anesthesiologists liable in tort to Levitt on the theory they allowed an unreasonably dangerous condition to exist by not prohibiting the warming of any IV solutions and, by extension, blood, in a kitchen microwave. The Anesthesiologists' brief continually points out that Wilkinson's theory of liability is not warranted by existing law. Assuming arguendo this is true, it still does not account for that portion of the rule which allows a claimant to expand the boundaries of case law by advocating a good-faith argument for the extension, modification, or reversal of existing law. Sanctions should not be used to chill new theories of recovery that are now novel, but may one day become

---

9. Christine Jones, CRNA, likewise did not seek sanctions.

recognized. We note that the theory of allowing the existence of an unreasonably dangerous condition is a common theory in premises liability cases and in general tort cases.[10] While we have not found it to be a theory used often in the reported medical negligence cases, that is not to say advancement of this theory is totally without merit in such a novel context. While we do not offer an opinion on the viability of such a theory, we have found sufficient objective evidence in the record to support the advocation of such a theory. We agree that, for whatever reason, that theory was insufficiently supported by admissible evidence at trial and was thus unable to withstand a demurrer. The fact the theory against these particular defendants ultimately fell short, due to evidentiary and procedural infirmities, of the necessary prima facie proof to require submission of that theory to the jury does not retroactively make the entire theory frivolous or without a reasonable basis in law.

Thus we hold that the trial court abused its discretion in granting sanctions against Wilkinson as to these defendants. We wish to point out that while this court does not condone the naming of unnecessary defendants, and condemns the "shotgun" approach to naming defendants, we have scrutinized this voluminous record with the knowledge that novel theories of law are often pled inefficiently at first. We recognize the law to be a dynamic evolving body which must make room for theories that are often at first unpopular or misunderstood. A review of manufacturers product liability law before *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla.1974), would have led to a conclusion that it would have been sanctionable to bring in multiple manufacturing defendants involved in introducing a product into the stream of commerce. The evolution of this body of law would have proved such an initial conclusion erroneous.

We therefore vacate the portion of the order awarding sanctions to defendant Drs. Jones, Breipohl, Anthony, Spohr, Singletary,

Voss, Wiesemeyer, and Brothers (Anesthesiologists).

### C. Claims against Pathologists

■■■ Wilkinson named Dr. Puls, Dr. Hubner, Jerry L. Puls, M.D., Inc., and South Utica Pathology Laboratories, Inc. (Pathologists) as defendants. He alleged these defendants were in charge of establishing and overseeing the procedures used in the blood bank at Hillcrest.

Wilkinson's cause of action against the Pathologists is similar to that lodged against the Anesthesiologists: allowing a dangerous condition to exist by virtue of improper training and failing to establish proper rules and procedures regarding the warming of IV solutions and blood. As a result, based upon their superior knowledge as to the dangers to patients in general, they violated a duty to Levitt, which caused her death. Wilkinson consulted Dr. Larson, an anesthesiologist, before the amended petition was filed. There is no evidence that Wilkinson ever consulted a pathologist prior to filing his amended petition.

The Pathologists argued at the sanctions hearing and in their appellate brief that Wilkinson had no basis in fact or law for filing the initial claim against the Pathologists or that, assuming he did have such a basis in law or fact, he did not produce sufficient evidence to maintain the claims against them. The analysis of the arguments presented by the Pathologists differs from that of the Anesthesiologists in that the expert relied upon by Wilkinson was not himself a specialist in pathology, but anesthesiology. Further, the criticisms of the defendant Pathologists are not based upon actions done in the course of their specialty as pathologists, but as operators of the hospital's blood bank.

The trial court's findings of fact and conclusions of law contain the following statement related to the Pathologist defendants:

> [T]he evidence adduced at the hearing showed that at the close of discovery, not one of Plaintiffs' experts had testified in deposition that the Pathologists acted or

---

**10.** *See Grover v. Superior Welding, Inc.*, 893 P.2d 500 (Okla.1995); *Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla.1994); *McKinney v. Harrington,* 855 P.2d 602 (Okla.1993); *Chase v. Parry,* 326 P.2d 809 (Okla.1958); *Robison v. Stokes,* 882 P.2d 1105 (Okla.Ct.App.1994).

failed to act in such a manner that they caused or contributed to the death of Norma Levitt.

This finding was erroneous. Wilkinson's expert witness, Dr. Larson, was deposed on August 14, 1992, at which time he set out his criticism of Drs. Puls and Hubner, as individuals. We must assume that Dr. Larson's opinions, set out in part below, are the same opinions conveyed to Wilkinson in his pre-filing investigation, and are the opinions that Wilkinson in turn relied upon as the basis for filing his amended petition. In response to questioning, Larson stated:

Q. Sir, do you have any reason to believe that the death of Norma Levitt was somehow related to a failure on the part of Dr. Puls or Dr. Hubner to maintain properly functioning, reliable blood warmers in the hospital?

A. Yes.

. . . .

Q. The next criticism listed there is a "failure to stop the use of microwave ovens for warming I.V. solutions." Do you have any information that Dr. Hubner and Dr. Puls were in any way aware of this practice?

A. No. They should have been aware of it if it was a hospital policy and it was in the nursing guidelines that this was acceptable practice, and they were responsible for the warming equipment for solutions. They should have been aware that there was another means being used in the hospital besides their equipment for warming any kind of intravenous solution.

Q. Are you under the impression that there was something in the nursing guidelines that would have gone under the nose of Dr. Hubner and Dr. Puls permitting the use of microwave ovens to warm I.V. solutions?

A. Well, I presume he would see the policies and procedures relating to the warming of solutions since he was responsible for that activity in that hospital. He should have known about it. They should have brought it to his attention.

The defendant Pathologists contend that because Dr. Larson was an anesthesiologist, and not a pathologist, Wilkinson had no reasonable basis to rely on Larson's testimony in support of a claim against the defendant Pathologists. In other words, the Pathologists claim that only a fellow pathologist was qualified to render an opinion against them. Wilkinson's pathology expert, Dr. Zuck, had no criticism of the defendant Pathologists. Therefore, conclude the Pathologists, Larson's testimony was insufficient to form a basis to file or maintain an action against them.

We disagree. Title 12 O.S.1991 § 2702 reads:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise.

 While we are familiar with the practice of expert witnesses testifying only against those in a similar specialty, we find there is sufficient basis in the law to hold that such a practice, though common, is not absolutely essential to maintain the viability of a lawsuit. See Quinton v. Farmland Industries, Inc., 928 F.2d 335 (10th Cir.1991). "The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." Payton v. Abbott Labs, 780 F.2d 147, 155, 156 (1st Cir.1985); Sprague v. Bowen, 812 F.2d 1226 (9th Cir.1987); LeMaire ex rel. LeMaire v. United States, 826 F.2d 949 (10th Cir.1987); Heinze v. Heckler, 581 F.Supp. 13 (E.D.Pa.1983). We therefore conclude that Wilkinson had a sufficient objective basis in law to rely upon the qualifications of Dr. Larson, anesthesiologist, to render an expert opinion regarding the blood bank at Hillcrest run by the defendant Pathologists. That reliance, though arguably tenuous, was sufficient to support the initial filing of the amended petition.

We therefore hold that the finding set out above in the trial court's order was erroneous. If the award of sanctions against Wilkinson in favor of the Pathologists was grounded solely on a lack of basis to file the

claim, we would vacate completely that portion of the order awarding sanctions on that basis. However, there remains the issue of whether Wilkinson had a sufficient basis to continue to hold the defendant Pathologists in the lawsuit.

Well before trial it became objectively apparent that Wilkinson's case against the defendant Pathologists had evaporated. During the deposition of Dr. Larson taken August 14, 1992, Dr. Larson was asked the following question:

> Q. Are you qualified or are you an expert witness in the area of blood banking?
> A. No.

Larson went on in his deposition and expressed criticism of Drs. Puls and Hubner for not prohibiting the use of microwave ovens in the warming of IV solutions in their capacity as directors of the Hillcrest blood bank.

Larson admitted again at trial that he did not consider himself an expert witness in the area of blood bank procedures. Dr. Larson admitted that though he knew "a substantial amount about blood banking," he stated "I'm not an expert witness in blood banking."

Moreover, we have reviewed the testimony of Wilkinson's remaining experts and found them to contain no criticism of the defendant Pathologists. Indeed, Dr. Zuck, the plaintiffs' expert on blood banks and blood transfusions, had no criticism of either Drs. Puls or Hubner. Zuck's deposition was taken June 10, 1992, a month before Larson's deposition.

Our analysis of this issue leads to the conclusion that at the sanctions hearing Wilkinson presented sufficient evidence that he conducted an adequate pre-filing investigation. His filing of a claim against the Pathologists was therefore based on an objective, reasonable belief that such a claim was well-grounded in law. There subsequently came a time, however, when Wilkinson should have known that his claim against the Pathologists was destined to fail. We find that time came on August 14, 1992, during the deposition of Dr. Larson. Although he was willing to express criticisms against the Pathologists, it was clear that because of his own admission that he was not an expert in blood bank procedures, Larson would be unqualified to render an expert opinion as to blood bank procedures. With his designated pathology expert earlier unable to fault the Pathologists, it was clear that Wilkinson would not be able to present sufficient evidence to maintain a viable cause of action against the Pathologists. Yet, Wilkinson went on for months before the defendant Pathologists were finally dismissed from the case at the close of the plaintiffs' case in chief on May 13, 1993. Wilkinson's failure to dismiss the Pathologists when it became clear he had no evidence against them was properly subject to sanctions.

■ Proceedings to impose sanctions are of equitable cognizance and, while an appellate court will examine and weigh the proof in the record, we will abide by the law's presumption that the decision is legally correct and cannot be disturbed *unless* found to be clearly contrary to the weight of the evidence or to some governing principle of law. If legally correct, the ruling may not be reversed because of the lower court's faulty reasoning, erroneous finding of fact, or its consideration of an immaterial issue. *Matter of Estate of Pope*, 808 P.2d 640, 646 (Okla. 1990).

We have reviewed the findings of fact and conclusions of law which set out the basis of the trial court's award of sanctions in favor of the Pathologists. Except for the one finding discussed above, we find that sufficient evidence supports the remainder of the order and that the decision is legally correct. Wilkinson does not preserve the issue as to the amount of sanctions, or the methodology used by the court in arriving at the figure. Accordingly, we vacate that portion of the order awarding sanctions to the Anesthesiologists against Bill V. Wilkinson, individually.[11]

### V

#### Conclusion

We affirm the award of sanctions in the amount of $12,500 each to defendants Hill-

11. *See* n. 6.

crest Healthcare Corporation, Hillcrest Medical Center Foundation, Hillcrest Real Estate, Inc., Hillcrest Service Company, Jerry L. Puls, M.D., Douglas Hubner, M.D., Jerry L. Puls, M.D., Inc., and South Utica Pathology Laboratories, Inc. We vacate the award of sanctions to the defendant Drs. Jones, Breipohl, Anthony, Spohr, Singletary, Voss, Wiesemeyer, and Brothers.

AFFIRMED IN PART AND REVERSED IN PART.

RAPP, V.C.J., and STUBBLEFIELD, J., concur.