2011 OK CIV APP 54

Lula LOUNDS, personal representative of the estate of David Shelton, deceased, Plaintiff/Appellee,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF VETERANS AFFAIRS, a state agency, Defendant/Appellant.

No. 107665.

Court of Civil Appeals of Oklahoma, Division No. 4.

March 25, 2011.

Joe S. Carson, Homesey, Cooper, Hill and Carson, Oklahoma City, Oklahoma, and Ryan Deligans, Durbin, Larimore & Bialick, Oklahoma City, Oklahoma, for Plaintiff/Appellee.

Lisa Erickson Endres, Assistant Attorney General, Oklahoma City, Oklahoma, for Defendant/Appellant.

DOUG GABBARD II, Vice Chief Judge.

¶ 1 Defendant, State of Oklahoma *ex rel.* Oklahoma Department of Veterans Affairs (State or ODVA), appeals a judgment in favor of Plaintiff, Lula Lounds, the daughter and personal representative of the estate of her father, David Shelton (Decedent). For the reasons set forth below, we affirm as modified herein.

## BACKGROUND FACTS

¶ 2 In November 2007, Plaintiff filed this action against ODVA, alleging that ODVA's negligent and improper medical care had resulted in Decedent's death less than three weeks after he was admitted to Norman Veterans Center (Center), an ODVA-operated nursing home. Indisputably, Plaintiff complied with Oklahoma's Government Tort Claims Act, 51 O.S.2001 & Supp.2010 §§ 151–200. Following a bench trial, the trial court granted judgment against ODVA for $175,000, the maximum amount permitted under 51 O.S. Supp.2010 § 154(A)(2).

¶ 3 A few weeks before trial, State filed a motion in limine seeking to exclude the testimony of Plaintiff's expert witness, Dr. Kaveh Kermanshahi, a board-certified family practice physician, asserting that he was not qualified to testify concerning "the nursing home standard of care" applicable to Center. Kermanshahi testified that, since 1993, more than 60% of his patients were age 65 or older, and that he had periodically provided care to patients residing in nursing home facilities. The trial court determined that Kermanshahi was qualified to testify as an expert, and that State's objection went to the weight rather than the admissibility of his testimony.

¶ 4 At trial, Plaintiff introduced evidence that Decedent, age 93, was admitted to Center on December 19, 2006, and that he died on January 5, 2007, after having lost more than 20% of his body weight. Decedent's cause of death was listed as congestive heart failure and acute renal (kidney) failure due to dehydration.

¶ 5 Kermanshahi's trial deposition was admitted over State's objection, and he testified that the care administered to Decedent was substandard, unacceptable, and below the acceptable standard of care, that there was inadequate monitoring of Decedent by Center, and that Center's improper and negligent care ultimately led to Decedent's dehydration and death. Kermanshahi admitted he had not read the specific U.S. Department of Veterans Affairs (VA) regulations which governed Center, but stated he was familiar with nursing home care generally, and described the standard on which he based his opinion:

[The] standard of care for any person in a setting of long-term care where the patient—whether long-term or acute—where the patient lives, eats, drinks, breathes within your premises, you then as a healthcare facility become liable for everything that transpired with that patient, specifically patient safety.

Make sure patient doesn't fall. Specifically nutrition, hydration, bowel movements. Even down to things as comfort of the mattress so the patient doesn't get decubitus ulcers, to the level of activity level. . . .

When they live on your facility, they become your guest, they become your responsibility. That's—I don't know if that is written anywhere, but that is something all of us as healthcare professionals know.

¶ 6 Plaintiff also presented evidence that Center had deviated from its own Nursing Policies and Procedures manual. She elicited testimony from Center's medical director, Dr. Pamela Hiti, that Center had failed to consistently follow its policies in providing care to Decedent. Plaintiff introduced medical records from Center reflecting that Decedent consistently received far less than 1,500 cc's of fluids daily—the minimum amount recommended by his physician (and by Hiti in her testimony)—without anyone questioning his condition or notifying his physician; that Center failed to weigh Decedent as frequently as ordered by his physician; that Center failed to otherwise monitor Decedent's weight or monitor him for dehydration; and that Center failed to promptly respond to Decedent's family's expressions of concern about Decedent's condition. Hiti testified that she was "not proud of the documentation" concerning Decedent's care, and, if Plaintiff's testimony accurately reflected the care provided, then that care fell below the acceptable standard and she was "disappointed" at the care provided to Decedent.[1]

¶ 7 Plaintiff, a licensed practical nurse, testified that Decedent had suffered a stroke that left him in a wheelchair with aphasia, although he remained alert, coherent, and able to communicate. She stated he had a good appetite and was able to feed himself, and "didn't have any major medical problems going on" at the time he was admitted to Center. She also presented evidence that, about a year prior to his admission to Center, Decedent's primary care physician had prescribed a diuretic, furosemide (Lasix), in a dosage of 40 mg twice a day as needed, due to a diagnosis of congestive heart failure. Plaintiff testified that Decedent had improved to the point that he no longer needed two doses of the diuretic each day. However, after Decedent was admitted to Center, Plaintiff stated that she and her mother became alarmed about his deteriorating condition, including severe lethargy, confusion, weakness, and apparent weight loss, that she checked his medication chart on January 1, discovered that Center was consistently administering the Lasix medication in the full prescribed dosage, and expressed her concern to Center's staff. She testified that, during the next two days, she informed a number of the staff that her father was dehydrated and should have the Lasix medication reduced. She presented evidence that a January 3 lab test confirmed he was severely dehydrated, and, although IV fluids were then started, her father died the morning of January 5.

¶ 8 Plaintiff admitted she had not told Center's staff that her father was not taking the full dosage of diuretic each day when he was admitted. However, she attributed this to

1. The following exchange occurred during Hiti's questioning by Plaintiff's counsel:

Q Well, I'll represent to you ... that there's testimony before this Court that the option was presented to [Plaintiff] within an hour before her dad expiring to transfer him to [a Norman hospital]. She was also told, after the lab levels came back that showed he was dehydrated, that we're starting him on IV's, we have it under control. If [Plaintiff] is honest with this Court, does that type of care fall below the acceptable standard of care that you would want done in the Veterans Center of Norman?

A Yes.

Q Okay. As the Medical Director of the Norman Veterans Center, based on your review of this chart and the things I've pointed out to you here today, are you proud of the care that was given to [Decedent]?

A I'm not proud of the documentation.

Q I understand. That's not my question. And I think we've already established that it's the Veterans Center's responsibility to make sure that care is documented correctly, documented accurately and documented consistently with the care provided, right?

A Correct.

Q So assuming that your employees and staff at the Norman Veterans Center documented the care provided to [Decedent] in an accurate way, are you proud of the care provided to [Decedent]?

A No.

Q Are you outraged at the care provided to [Decedent]?

A I would say I'm disappointed....

...

Q Based upon the documents you have before you, is the lack of monitoring the significant dehydration, the weight loss and the lack of fluid intake, is that outrageous to you?

A That's concerning.

Center's failure to give her an intake consultation, a consultation which would have involved a discussion of Decedent's initial "baseline" assessment and medications. Plaintiff stated that she never received such a consultation due to the staff's unavailability.[2]

¶ 9 State called one witness in its case in chief, Elizabeth Factor, a registered nurse who worked in Decedent's unit on staff at Center. Factor described Decedent as combative, non-compliant, and upset to be at Center, and said she attributed his declining condition to the fact that he missed being at home. She said she checked Decedent every day she was on duty, and attributed his documented weight loss to recording errors.

¶ 10 State argued, and Hiti testified on cross examination, that Center is subject to federal regulations promulgated by the VA and VA long-term care facilities, rather than state statutes and regulations governing other Oklahoma nursing homes. However, at trial, State never advised the trial court of the specific VA regulations which it asserted applied.

¶ 11 After considering the evidence, the court found that Center "violated its own policies and procedures, and otherwise provided care falling below the acceptable standard of care," that it breached certain quality of care requirements for nursing homes seeking to qualify for Medicare and Medicaid reimbursement, and that its negligence resulted in Decedent's death. The court also specifically found that Plaintiff had "proven by a preponderance of the evidence" that her damages "exceeded the statutory cap," but that damages were limited to $175,000 by the Tort Claims Act. State appeals.

## STANDARD OF REVIEW

¶ 12 Different standards of review apply to issues raised by State on appeal. State's contention that Plaintiff failed to prove the proper standard of care as a matter of law raises an issue of law, which this Court reviews *de novo*. *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, n. 1, 932 P.2d 1100.

¶ 13 State's contention, that the trial court's verdict is not supported by sufficient evidence, is reviewed under the following standard: "If there is any evidence tending to support the findings and judgment of the trial court at a bench trial ... the findings and judgment will not be disturbed, even if the record might support a conclusion different from that reached" in the court below. *Sides v. John Cordes, Inc.*, 1999 OK 36, ¶ 16, 981 P.2d 301, 307.

¶ 14 State's contention that the trial court erred in admitting Plaintiff's expert testimony is reviewed for abuse of discretion. *Sharp v. 251st Street Landfill, Inc.*, 1996 OK 109, ¶ 6, 925 P.2d 546, 549; *see also Christian v. Gray*, 2003 OK 10, ¶ 42, 65 P.3d 591, 608. Abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling. *Gray* at ¶ 43, 65 P.3d at 608.

## ANALYSIS

### 1. Standard of Care and Sufficiency of Proof

¶ 15 At trial, State did not dispute that Decedent's death was caused by acute renal

---

2. Plaintiff testified:

[T]he PA [physician's assistant], Carrol Perry, I believe was her name, came and introduced herself and said what we were going to do for dad. She said they were going to do a baseline assessment of him. They were going to take his vitals and weigh him and get an assessment.... And she said after she got an assessment of him they would come back and she would talk with me and go over his basic medications and ask me questions.... And we waited for them to do the assessment. And then after a while someone came and say—by this time it was almost lunchtime. They said, "Why don't you go to lunch and when you come back"—I believe it was Ms. Perry. She said, "Why don't you go to lunch and when you come back then I'll talk to you and go over his... medications and everything with you." We left the facilities.... Had lunch. Came back .... and waited to speak with the PA. And we waited for about an hour so so and she never came so I asked, I don't know, one of the employees if we could talk with her.... They finally came back and said, "Well, she said she's busy right now. She'll come back and do assessment with you later or if she have questions she will call you later." So she said, "Go ahead and go home."

Plaintiff stated she never received a call from the physician's assistant, and the assessment meeting never occurred.

failure brought on by dehydration. In fact, during the hearing on State's motion to exclude Kermanshahi's testimony, State's counsel argued that "[t]here is no dispute on causation," that the record contained "plenty of evidence that is undisputed about the acute renal failure," and that State's "defense . . . throughout this whole thing is the standard of care."

■ ¶ 16 On appeal, State again argues that Plaintiff's case failed as a matter of law because Plaintiff did not present "sufficient evidence at trial" to establish the "appropriate" standard of care for Center. The crux of its argument is that the Norman Veterans Center's standard of care is established by the Code of Federal Regulations, at 38 C.F.R. §§ 51.60 *et seq.*; that Kermanshahi was not aware of these regulations and was unqualified to testify about the standard of care; that the regulations were otherwise "never mentioned or relied upon by the Plaintiff in establishing negligence," and, therefore, the trial court could not have applied an appropriate standard of care in finding State negligent.

■ ¶ 17 In order to establish a prima facie case of negligence against a health care provider, Oklahoma law requires a plaintiff to prove the appropriate standard of care. *Benson v. Tkach*, 2001 OK CIV APP 100, ¶ 10, 30 P.3d 402, 404. However, Oklahoma recognizes both statutory and common law tort claims for negligence against health care providers, with potentially differing standards of care.

¶ 18 The common law claim was recognized in *Harder v. F.C. Clinton*, 1997 OK 137, ¶ 11, 948 P.2d 298, 304, wherein the Supreme Court stated:

A hospital has the duty to provide for the care and protection of its patients, and in the performance of this duty the hospital is required to exercise such reasonable care as the patient's known condition re-

quires. *Vis-a-vis* its resident, a nursing home stands in a relationship similar to that which a hospital occupies opposite its patient. A resident is under the control and in the care of an entity to which (his or her) safety is entrusted. A nursing home has a duty to provide care at a reasonable standard, taking into consideration the resident's known mental and physical condition.[3]

The common law claim of negligence against veterans' medical and rehabilitative centers has been recognized by Congress and is codified at 38 U.S.C. § 1151(a)(OCIS 2011).

¶ 19 The claim of statutory negligence was discussed in *Morgan v. Galilean Health Enterprises, Inc.*, 1998 OK 130, 977 P.2d 357. There, in a negligence suit brought against a nursing home subject to the Oklahoma Nursing Home Act, the Oklahoma Supreme Court held that the standard of care to govern in the nursing home setting when a plaintiff brings a "statutory tort" claim is "shaped" and determined by the provisions of the Act. *Id.* at ¶ 9, 977 P.2d at 362; *see also Whitaker v. Hill Nursing Home, Inc.*, 2009 OK CIV APP 41, 210 P.3d 877.

¶ 20 In the present case, evidence was presented which arguably supported these alternative theories of negligence. Ultimately, the trial court found in favor of Plaintiff under both alternative theories.

¶ 21 On the claim of common law negligence, Plaintiff presented evidence supporting the trial court's conclusion that Center failed to use ordinary care under the circumstances in caring for Decedent. Kermanshahi testified regarding the applicable "standard of care" in treating geriatric and nursing home patients and concluded that Center had not provided such care to Decedent. The standard of care he described echoes the standard described in *Harder v. F.C. Clinton*, clearly taking into account that a nursing home is the "caretaker" of its

---

3. It has also been noted:

The general standard of care required of a rest, convalescent, or nursing home is the degree of care, skill, and diligence used by such homes generally . . . The duty of a rest, convalescent, or nursing home in a particular case depends on the circumstances. It must there-

fore be commensurate with the patient's physical and mental condition and must take into account his ability or inability to care for himself.

Laurent B. Frantz, Annotation, *Patient Tort Liability of Rest, Convalescent, or Nursing Homes*, 83 A.L.R.3d 871, 875 (1978)(footnotes omitted).

guest-a resident who has been entrusted to its care and control, with the specific care required dependant upon the physical and/or mental condition of the resident at the time.

■ ¶ 22 Moreover, Kermanshahi was clearly qualified to give his opinion. Under 12 O.S. Supp.2010 § 2702:

[A] witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:

1. The testimony is based upon sufficient facts or data;

2. The testimony is the product of reliable principles and methods; and

3. The witness has applied the principles and methods reliably to the facts of the case.

Kermanshahi was not only a board-certified licensed physician, but had years of practice and experience as a family physician working with geriatric patients who had conditions and needs similar to those of Decedent's. Whether or not he was familiar with federal regulations concerning veterans' nursing homes, he was clearly qualified to testify as to the appropriate methods of diagnosing, monitoring, treating, and providing daily care to geriatric patients like Decedent. "The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Warner v. Hillcrest Med. Ctr.,* 1995 OK CIV APP 123, ¶ 42, 914 P.2d 1060, 1071, quoting *Payton v. Abbott Labs,* 780 F.2d 147, 155, 156 (1st Cir.1985), and citing *Sprague v. Bowen,* 812 F.2d 1226 (9th Cir.1987), and *LeMaire ex rel. LeMaire v. U.S.,* 826 F.2d 949 (10th Cir.1987).

¶ 23 Plaintiff also elicited testimony from Center's own medical director, Dr. Hiti, who admitted that Center failed to satisfactorily provide Decedent with quality care, thereby breaching the appropriate standard. Thus, the record contains compelling evidence supporting a claim of common law negligence

against Center, and the trial court's judgment of negligence must be affirmed on this basis alone.

■ ¶ 24 The trial court also based its judgment upon the alternative theory of statutory negligence. On appeal, both parties agree that, while the Center is not subject to the Oklahoma Nursing Home Act, 63 O.S. 2001 & Supp.2010 § 1–900.1 et seq., it *is* subject to VA regulations delineating the standards applicable to nursing homes in order to qualify for federal "per diem" payments for veterans' nursing home care. These regulations, enacted pursuant to 38 U.S.C. §§ 101 *et seq.,* appear at 38 C.F.R., Part 51 and address residents' rights, their quality of life, and their quality of care. *See* 38 C.F.R. §§ 51.70 ("Resident rights"), 51.100 ("Quality of life"), and 51.120 ("Quality of care"). Similar provisions delineating the standards applicable to nursing homes seeking to qualify for federal Medicare and Medicaid payments are the regulations cited by the trial court in its order, and are found at 42 C.F.R., Part 483. The VA regulations and Medicare/Medicaid regulations governing quality of care issues and residents' rights are in many respects identical. This is specifically true of the regulation cited by the trial court, 42 C.F.R. § 483.25, and its equivalent under the VA regulations, 38 C.F.R § 51.120.

¶ 25 Plaintiff's evidence clearly supports the trial court's conclusion that Center breached the applicable federal regulations.[4] However, neither Plaintiff nor State has argued that the federal regulations or statutes provide a private right of action similar to that provided by § 1–1918 of the Oklahoma Nursing Home Act.

¶ 26 In *Morgan v. Galilean Health Enterprises, Inc.,* the Supreme Court held that legislative language shows an intent to create a cause of action where there are explicit references in the enactment's text to one's right to vindicate a breached duty, such as by the frequent reference to the term "viola-

---

4. Obviously, the trial court's order contains citation errors in Paragraphs 6, 7, and 10 of its Conclusions of Law, to the extent it finds that Center was subject to, and breached, regulations at 42 C.F.R. § 483 and 42 C.F.R. § 483.25, rath-

er than the regulations appearing at 38 C.F.R., Part 51, including 38 C.F.R. § 51.120. In her appellate brief, Plaintiff essentially admits this, and agrees that the regulatory citation argued by State is correct.

tion." *Id.* at ¶ 9, 977 P.2d at 362. In that case, the Court noted that the Oklahoma Nursing Home Act clearly provided that "violations" of its provisions might result in penalties and that § 1–1918 stated, in part:

> In addition to the penalties provided in this section, an action may be brought against an individual by any resident who is injured by any violation of this section … If damages are alleged and proved in the action, the plaintiff shall be entitled to recover from the defendant the actual damages sustained by the plaintiff. If it is proved in an action that the defendant's conduct was willful or in reckless disregard of the rights provided by this section, punitive damages may be assessed.

In contrast, the federal regulations establishing standards for federal per diem payments, and for Medicare and Medicaid payments to veterans' centers, rarely use the word "violation," only provide for termination or suspension of federal fund payments, and do not express a legislative intent to fashion a private right of action for nursing home residents to redress a violation of the regulations, except through an administrative grievance process. *See* 38 C.F.R. § 51.70(f). We are also unable to conclude that Congress intended to imply a private cause of action.[5] Accordingly, the trial court's judgment in favor of Plaintiff on her alternative theory of statutory negligence was error and should be stricken.

### 2. Damages Award

■ ¶ 27 State also asserts that the trial court's award of $175,000 was excessive and not supported by the evidence, relying largely on an argument that centers around Decedent's advanced age, his · relatively poor health, and the fact that testimony came primarily from Plaintiff rather than Dece-

dent's widow or other siblings. Again, we reject State's argument.

¶ 28 The trial court specifically based its damages award not only on the monetary expenses associated with Decedent's death and burial, but on Decedent's pain and suffering, the loss of companionship and grief of his family, and other factors now set forth in *Oklahoma Uniform Jury Instructions—Civil, Instruction No. 8.1.* These damages were supported by the testimony of Plaintiff and Decedent's part-time caretaker, Annette Jenkins, who testified at length about the effect of Center's poor treatment on Decedent and his family.

### CONCLUSION

¶ 29 For all these reasons, the trial court's judgment and damages award to Plaintiff is affirmed as modified.

¶ 30 AFFIRMED AS MODIFIED

GOODMAN, P.J., and RAPP, J., concur.

---

**5.** In *Holbert v. Echeverria*, 1987 OK 99, 744 P.2d 960, the Supreme Court adopted the first three prongs of the implied cause of action test set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Those prongs are: (1) the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) some indication of legislative intent, explicit or implicit, suggests that Congress wanted to create a private remedy and not to deny one; and (3) implying a remedy for the plaintiff would be consistent with

the underlying purposes of the legislative scheme. Essentially, the central inquiry is whether Congress intended to create a private right of action. *Holbert,* n. 9. Clearly, it had no intent to do so here. Although *Holbert's* holding has been superceded by statute, the modified *Cort* test is still employed for determining the existence of a private cause of action. *Raven Res., L.L.C. v. Legacy Bank*, 2009 OK CIV APP 101, n. 15, 229 P.3d 1273.